## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

MICHAEL MILLER,

      Plaintiff,

v.

AHMED HOLT, officially, JACK RANDY
SAULS, officially, MARLAH MARDIS,
individually and officially, SHARON
LEWIS, individually, JACOB BEASLEY,
individually and officially, SHENECA KING,
individually and officially, TIMOTHY
ROBERTS, individually and officially,
SHAWN EMMONS, individually,
ALEXANDER TILLMAN, individually,
LACHESHA SMITH, individually, and
MARK AGBAOSI, individually,

    Defendants.

CIVIL ACTION
FILE NO. _____

## COMPLAINT

Michael Miller is a 62-year-old man with advanced-stage lung cancer and other serious, chronic health conditions, in the custody of the Georgia Department of Corrections ("GDC"). Mr. Miller has been housed at the Georgia Diagnostic and Classification Prison ("GDCP") since 1988, and he is entirely dependent on GDC for his health care. Mr. Miller was diagnosed with lung cancer in late July 2020. This came over six months after Mr. Miller began displaying alarming symptoms of a malignancy in his lungs, and over six months after Mr. Miller and his legal team begged GDCP staff and GDC officials to provide Mr. Miller with the necessary diagnostic tests and medical treatment. Even after the inexcusable delay in Mr. Miller's diagnosis, over a year passed before Mr. Miller received any cancer treatment—against the

1

advice of his oncologist and despite continuous pleas from Mr. Miller and his legal team—allowing the cancer to further progress and causing many medical emergencies for Mr. Miller in the interim. Once started in September 2021, the treatment provided by GDCP and GDC's contracting medical providers was inconsistent and inadequate. Defendants' actions caused Mr. Miller to miss appointment after appointment. Against his treating oncologist's orders, and for still unknown reasons, Mr. Miller's chemotherapy treatment ended in January 2023. Between January 2023 and December 2024, his oncologist appointments were sporadic at best, with two oncologists who had so little information about Mr. Miller's condition that they did not even know what type of cancer he had.

In that time, Mr. Miller's cancer progressed to the point where his prognosis is now very grim, and his health continues to deteriorate. It was not until Mr. Miller was hospitalized for untreated pneumonia in September 2024, that he eventually obtained records of the hospital's scans documenting his nodules increasing in "size and number." Not a single medical professional or GDC employee alerted Mr. Miller to the life-threatening update. Rather, it was his *legal team* who noticed the prognosis when they received the records from this hospitalization. It was only then, in December 2024, after aggressive efforts by his legal team, that Mr. Miller saw yet another new oncologist, who finally recognized the severity of his condition and expressed grave concern about the years-long lack of treatment. It then took five more months for this new oncologist to re-assess and re-diagnose Mr. Miller's cancer, and again order him to be placed on a chemotherapy regimen. Defendants were only able to successfully transport Mr. Miller to *one* chemotherapy treatment, in late April 2025. After that, Defendants' deliberate indifference to Mr. Miller's serious medical needs once again caused him to miss multiple critical chemotherapy treatments—including Mr. Miller's August 11, 2025,

chemotherapy appointment, which he missed because he was not provided with a required steroid injection prior to the appointment.

In addition to Defendants' deliberate indifference to Mr. Miller's stage IV lung cancer, Defendants have also failed to provide medically-necessary treatment for other serious medical conditions, despite obvious signs of serious medical needs and repeated requests for medical care through verbal pleas and written requests to Defendants. Defendants have subjected Mr. Miller to years of unreliable access to his prescribed medications, most concerning of all his morphine, resulting in frequently reoccurring pain and opioid withdrawal. At present, Mr. Miller has gone over two months without his prescribed morphine. Although Defendants have provided Mr. Miller with a substitute medication, this medication has not been provided to Mr. Miller consistently and, even when provided, does not adequately treat his pain and causes serious side effects, such as severe nausea. Defendants have ignored Mr. Miller's repeated requests to manage the side effects and try other medications that can effectively manage his pain until he is provided his prescribed morphine again.

This is a civil rights action for damages, declaratory, and injunctive relief brought under 42 U.S.C. § 1983 arising from the grossly deficient medical care at Georgia Diagnostic and Classification Prison, which has caused unnecessary pain and suffering and the deterioration of Michael Miller's health from inadequately treated lung cancer, sporadic and interrupted delivery of critical pain medication, and other serious, debilitating, and life-threatening medical conditions. Numerous systemic practices and policies under the control of the Defendants have caused the healthcare provided to Mr. Miller to fall below constitutional standards. Defendants' failures create a substantial and intolerable risk of serious harm to Mr. Miller's life and physical health, permanent worsening of his conditions, and unnecessary pain and suffering.

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. § 1983, and this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

2.      This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(1), because all Defendants are Georgia residents and at least one Defendant resides in the Macon Division of the Middle District of Georgia, and under 28 U.S.C. § 1391 (b)(2), because a substantial part of the events giving rise to this action occurred in the Macon Division of the Middle District of Georgia.

## PARTIES

### A. Plaintiff

3.      Michael Miller, the Plaintiff, is a United States citizen and a resident of Georgia. He is incarcerated at GDCP in Butts County, Georgia, and has been in the custody of GDC at all times relevant to this complaint.

### B. Defendants

#### a. Agency Defendants

4.      Defendant Ahmed Holt is the Assistant Commissioner of the Facilities Division of GDC. He has held this position since December 2019. He is responsible for monitoring the supervision and safety of incarcerated persons, including those housed at GDCP, as well as overseeing the Inmate Transportation Unit. Defendant Holt's responsibilities include adopting and enforcing policies, customs, and practices relating to the housing and safety of all incarcerated persons in GDC, as well as training and supervising GDC personnel responsible for housing and safeguarding people under GDC's custody. Defendant Holt is sued in his official capacity as Assistant Commissioner acting under color of law.

4

5.      Defendant Jack "Randy" Sauls is the Assistant Commissioner of the Health Services Division of GDC. He has held this position since August 2016. He is responsible for monitoring the medical treatment and care of all people incarcerated in the Georgia Department of Corrections, evaluating the quality of medical care provided in GDC, and for exercising final decision-making authority regarding such persons' treatment and care. Defendant Sauls is further responsible for training, supervising, and controlling GDC medical personnel (including Defendants Lewis and Mardis) and adopting and enforcing policies, customs, and practices regarding the medical care and treatment of people in GDC custody. Defendant Sauls is sued in his official capacity as Assistant Commissioner acting under color of law.

6.      Defendant Dr. Marlah Mardis is the Statewide Medical Director of the GDC. She has held this position since April 2024, and served as the Interim Director prior to that. As Statewide Medical Director, she has the highest medical authority for GDC and is responsible for monitoring and evaluating the medical services delivered to incarcerated persons and the administrative oversight of such services. Defendant Mardis has the responsibility to assist Defendant Sauls in controlling, training, and supervising GDC medical personnel and adopting and enforcing policies, customs, and practices regarding the medical care and treatment of people in GDC custody. Defendant Mardis is sued individually and in her official capacity as Medical Director acting under color of law.

7.      Defendant Dr. Sharon Lewis was the Statewide Medical Director of the GDC during all times relevant to this complaint until her retirement in 2024. As Statewide Medical Director, she was the highest medical authority for GDC and was responsible for monitoring and evaluating the medical services delivered to incarcerated persons and the administrative oversight of such services. Defendant Lewis had the responsibility to assist Defendant Sauls in

5

controlling, training, and supervising GDC medical personnel and adopting and enforcing policies, customs, and practices regarding the medical care and treatment of people in GDC custody. Defendant Lewis is sued in her individual capacity. At all times relevant to this complaint, Defendant Lewis acted under the color of law.

### b. Prison Administration Defendants

8.      Defendant Jacob Beasley is the Warden at GDCP. He has held this position since July 16, 2025. As Warden, he is responsible for overseeing the security and health, and protecting the constitutional rights, of all persons held in GDCP's custody. Defendant Beasley is also responsible for the implementation, oversight, and supervision of policies and practices at GDCP, and exercises control over GDCP by making staffing, budget, and administrative decisions. He is responsible for supervising all staff at GDCP, including security staff, medical staff, and Defendants King and Roberts.  Defendant Beasley is sued individually and in his official capacity as Warden acting under color of law.

9.      Defendant Sheneca King is a Deputy Warden of Security at GDCP. She has held this position since January 2022. She is responsible for overseeing security staff members and the security and health of incarcerated persons at GDCP. Defendant King is sued individually and in her official capacity as Deputy Warden acting under color of law.

10.      Defendant Timothy Roberts is a Deputy Warden of Security at GDCP. He has held this position since June 2024. He is responsible for overseeing security staff members and the security and health of incarcerated persons at GDCP. Defendant Roberts is sued individually and in his official capacity as Deputy Warden acting under color of law.

11.      Defendant Shawn Emmons was the Warden at GDCP from July 2023 until July 2025. As Warden, he was responsible for overseeing the security and health, and protecting the

constitutional rights, of all persons held in GDCP's custody. Defendant Emmons was also responsible for the implementation, oversight, and supervision of policies and practices at GDCP, and exercised control over GDCP by making staffing, budget, and administrative decisions. He was responsible for supervising all staff at GDCP, including security staff, medical staff, and Defendants Tillman, King, and Roberts.  Defendant Emmons is sued individually. At all times relevant to this complaint, Defendant Emmons acted under color of state law.

12.     Defendant Alexander Tillman was the Deputy Warden of Care and Treatment at GDCP from July 2024 until approximately July 2025. He was responsible for the coordination and delivery of health services to men housed at GDCP, oversight of the daily operation of medical services at GDCP, and supervision of the medical staff at GDCP. Defendant Tillman is sued individually. At all times relevant to this complaint, Defendant Tillman acted under color of state law.

13.     Defendant Mark Agbaosi was the Deputy Warden of Security at GDCP from December 2022 to February 2025. He was responsible for overseeing security staff members and the health and security of incarcerated persons at GDCP. Defendant Agbaosi is sued in his individual capacity. At all times relevant to this complaint, Defendant Agbaosi acted under color of state law.

14.     Defendant LaChesha Smith was the Deputy Warden of Care and Treatment at GDCP from December 2022 to July 2024. She was responsible for the coordination and delivery of health services to men housed at GDCP, oversight of the daily operation of medical services at GDCP, and supervision of the medical staff at GDCP. Defendant Smith is sued in her individual capacity. At all times relevant to this complaint, she was acting under the color of law.

## STATEMENT OF FACTS

A.  **Defendants' Pattern of Refusing and Delaying Mr. Miller's Necessary Lung Cancer Diagnosis and Treatment**

15.     Advanced stage cancer requires quick and effective treatment. Months and years-long delays in cancer treatment can cause otherwise treatable cancer to be fatal. Inadequate delivery of cancer treatment, such as sub-therapeutic levels of chemotherapy or radiation, can lead to intense pain and suffering and early death.

16.     Defendants have provided medically and constitutionally deficient medical care for Mr. Miller's lung cancer.

17.     In 2020, Mr. Miller experienced over six months of severe symptoms such as coughing up blood, difficulty breathing, chest pains, nausea, vomiting, profuse sweating, and cardiac symptoms; concerning test results; months-long delays in diagnostic medical appointments; and pleas for "urgent" diagnosis and treatment by medical staff and Mr. Miller's legal team before he was provided a diagnosis of lung cancer.

18.     After his diagnosis in July 2020, it then took *well over a year* for GDC to begin any treatment—against the advice and written orders of his oncologist and despite continuous pleas from Mr. Miller and his legal team—allowing the cancer to progress and causing many medical emergencies for Mr. Miller in the interim.

19.     On September 7, 2021, Mr. Miller finally had his first chemotherapy appointment with Dr. Torey Clark and received his first prescribed infusion of Pemetrexed, Carboplatin, and Avastin.

20.     Once started, the treatment provided by GDCP and GDC's contracting medical providers was inconsistent and inadequate, with Defendants abruptly ending Mr. Miller's chemotherapy treatment early and without reason in January 2023.

21.     Recent scans show that in the years-long absence of appropriate treatment, Mr. Miller's stage IV lung cancer has continued to grow and spread.

### a. GDCP's Medical Care Systems and Policies Are Deficient

22.     As an incarcerated person at GDCP, Mr. Miller is entirely dependent on Defendants for all of his health care.

23.     GDCP offers incarcerated persons both on-site treatment at the GDCP infirmary and off-site treatment by local hospitals and specialists who contract with GDC, or at the Augusta State Medical Prison. Mr. Miller is unable to take himself to medical appointments or request providers outside of GDC contractors.

24.     The systems, policies, customs, and practices which make up the healthcare provided to Mr. Miller at GDCP constitute medically and constitutionally unacceptable practices which produce and add to Mr. Miller's pain and suffering.

25.     Mr. Miller must request care through "sick calls," a process that is not adequately available to him and which does not conform with GDC Standard Operating Procedures ("SOP").

26.     To submit a "sick call," incarcerated persons are instructed to fill out a Health Service Request Form and place it in a designated box. However, those Request Forms are not available in G-House, where Mr. Miller's cell is located, and incarcerated persons must instead ask a corrections officer or nurse to bring them one. But corrections officers and nurses do not consistently bring Mr. Miller a Form when asked. When Mr. Miller is able to get a Form, he must fill it out and submit it. However, the sick call box in G-House is not checked by GDCP staff and has not been in years, though it is supposed to be checked daily. Now, there is not even a sick call box to submit Request Forms to in G-House anymore. Instead, persons like Mr. Miller must attempt to find a nurse at pill call to give the Form to or give it to a corrections officer to

then submit elsewhere. What happens to the sick call request afterwards is completely dependent on the individual employee.

27.     It may take days or over a week for Mr. Miller to hear back about a sick call request, while other times he has submitted a form and never received a response at all and has not been taken to a sick call or seen by a healthcare professional. When Mr. Miller is finally seen by a physician, nurse, or other medical staff, it may be days or weeks later.

28.     As further documented below, inadequate access to—and inadequate responses to—Mr. Miller's sick call requests has caused delays and lapses in his cancer diagnosis and treatment, the delivery of his pain medication, and diagnosis and treatment of other serious medical conditions.

29.     The Prison Administration Defendants have direct knowledge through reports and firsthand experience of the inability of Mr. Miller and others to easily access Health Service Request Forms, and are further aware that Health Service Request Forms are not available to obtain or submit in G-House. The Prison Administration Defendants are also aware that the Request Forms are not checked daily, and sick calls are not scheduled despite serious and sometimes urgent symptoms being listed.

30.     Mr. Miller can only appeal delays in care or lack of care through the grievance process, a process which is also not adequately available to him and does not follow GDC's SOPs.

31.     To obtain a grievance form, Mr. Miller must obtain one directly from a counselor, as he is unable to submit a grievance reliably through the digital kiosk due to technological struggles and limits on access to the kiosk. To obtain a paper grievance form Mr. Miller must first make contact with another GDCP employee, have them call a counselor, and then have the

counsel or come to G-House. Many times, the counselor does not come to G-House when called or is not at GDCP at all. Once Mr. Miller has obtained a grievance form, he must then find a GDCP employee to take him to the counselor to submit the form. Once submitted, he is only sometimes given a receipt for the grievance, and even then, the receipt has no assigned number or any other meaningful way to know what the grievance refers to. After submitting, Mr. Miller often does not hear anything back about his grievance for months, or sometimes never at all, despite GDC policy mandating that he receive a response within 40 days of his grievance. This leads to an opaque system where Mr. Miller does not know how many "active" grievances he has at one time, and is sometimes asked to drop grievances in order to file new ones despite never receiving a response from older grievances.

32.     The Prison Administration Defendants have direct knowledge of the difficulties in obtaining and submitting grievances, through reports and first-hand interactions. All facility employees are required to attend grievance training. The Warden, in particular, must appoint a Grievance Counselor and Alternate Grievance Counselor who are responsible for ensuring compliance with Grievance SOP and coordinating timely investigation of grievances. Further, the Warden has specific responsibilities under the SOP for reviewing and making decisions on grievances in a particular timeline.

33.     Mr. Miller is reliant on medications provided to him through GDCP staff at "Pill calls," yet another process in which Prison Administration Defendants do not follow their own SOP, which calls for administering medication to incarcerated persons in a timely manner. Instead, as documented further below, Mr. Miller has suffered years of inadequate and untimely medication administration, both causing new pain and symptoms and exacerbating other pain

and conditions. In April 2025, for instance, after a series of bureaucratic failures, Mr. Miller went

nearly 10 days without his extended release morphine.

34.     Other systemic policies and procedures at GDCP which have caused a substantial

risk of serious harm to Mr. Miller include:

(a)  Routinely delaying or denying evaluations, treatment, and access to appropriate

medical care both within and outside of GDCP;

(b)  Declining to provide medically necessary treatments, including medication,

medical devices, screening tests, and chemotherapy;

(c)  Failing to keep adequate supply of and provide medication in accordance with

prescriptions and SOP;

(d)  Maintaining an insufficient number of qualified medical personnel such as

physicians and nurses, such that some medical tasks like Pill calls are delayed,

performed by unqualified individuals including corrections officials, or never

performed at all; and

(e)  Maintaining an insufficient number of corrections and safety staff to transport Mr.

Miller to his medical appointments or to be flagged down in times of medical

need.[1]

35.     For example, in mid-September 2024, Mr. Miller suffered from an illness which

caused him serious symptoms, including high fever, lack of appetite, fatigue, hallucinations,

difficulty breathing, and coughing up phlegm. Mr. Miller was effectively bed-ridden for two

---

[1] As of the Final Report Georgia Diagnostic & Classification Prison 2024 Assessment, GDCP had a security vacancy rate of 55%. In the 2024 System-Wide Assessment of the Georgia Department of Corrections report, GDCP was listed with a vacancy rate of 66.81% and was deemed to have reached an "emergency level" of staffing.

weeks. His serious symptoms were obvious to anyone who saw him. Despite placing multiple

sick calls and making verbal pleas to medical and correctional staff who came by death row, Mr.

Miller was not visited by a physician and was not taken to the GDCP infirmary for diagnosis or

care. Ultimately, Mr. Miller's illness progressed untreated such that he had to be hospitalized at

an outside facility, where he was diagnosed with pneumonia and a urinary tract infection. While

at the hospital, he was given prescription antibiotics. Once he returned to GDCP, he was not

given his prescribed antibiotics or cough suppressant until at least four days afterwards—and

even then, not in compliance with the prescription. When Mr. Miller confronted Defendant

Tillman about the lack of adequate medication delivery and needing to be taken to the infirmary,

Mr. Tillman told Mr. Miller that the prison did not have enough staff to take him to the

infirmary.

36.    The Prison Administration Defendants are responsible for Mr. Miller receiving

timely and appropriate medical care. They had direct knowledge of the shortages of medical and

security staffing through reports and first-hand knowledge, and are further directly aware of the

interruptions in Mr. Miller's medical treatment, such as inability to receive medications on time

or inability to be transported to necessary medical appointments, which have occurred as a result

of the shortages in staffing. The Prison Administration Defendants knew that these deficiencies

were preventing Mr. Miller from obtaining the medical care he desperately needed and yet still

failed to remedy the shortfalls, which they knew could have incredibly painful and possibly fatal

consequences for Mr. Miller.

37.    The Agency Defendants are also responsible for Mr. Miller receiving timely and

appropriate medical care. Defendants Sauls and Holt had direct knowledge of the shortages in

medical staffing and the impact of inadequate medical staffing on the provision of healthcare at

GDCP through numerous reports provided to them. The Agency Defendants knew that these deficiencies were preventing Mr. Miller from obtaining the medical care he desperately needed and yet still failed to remedy the shortfalls, which they knew could have incredibly painful and possibly fatal consequences for Mr. Miller.

38.     Defendants Mardis and Lewis had direct knowledge of the routine delays and denials of Mr. Miller's necessary health care and interruptions in medication. They were also aware of the shortages of medical staffing and the impact of inadequate medical staffing on the provision of healthcare at GDCP. Defendants Mardis and Lewis knew that these deficiencies were preventing Mr. Miller from obtaining the medical care he desperately needed and yet still failed to remedy the shortfalls, which they knew could have incredibly painful and possibly fatal consequences for Mr. Miller.

39.     Numerous reports have provided all of the Defendants with direct knowledge of these constitutional violations and systemic failures For example, in the 2024 Final Report GDCP Assessment presented to Defendant Emmons, the GDC Office of Professional Standards and Compliance Division compiled dozens of extremely worrisome findings about the healthcare at GDCP, including that clinicians were not meeting with patients for urgent consultations within the SOP required timeframes; medical staff were not making the necessary infirmary rounds as required by SOP; medical staff were not following up on chronic care patients as required by SOP; routine lab tests were not being conducted as required by SOP; and medical staff were not conducting or scheduling sick calls as required by SOP.

40.     At almost every step of the way, Defendants know they are failing to safeguard Mr. Miller's constitutional rights, creating a substantial and intolerable risk of serious harm to

Mr. Miller's life and physical health, permanent worsening of his conditions, and unnecessary pain and suffering.

### b. Inadequate Delivery of Cancer Treatment.

41.    Defendants have not provided Mr. Miller appropriate regular treatment for, or monitoring of, his life-threatening stage IV lung cancer.

42.    Over a year passed between Mr. Miller's lung cancer diagnosis in July 2020 and his first chemotherapy appointment in September 2021.

43.    Dr. Clark, Mr. Miller's first treating oncologist with decades of experience, assessed Mr. Miller and found that he needed chemotherapy on a "regimen" that repeated every three weeks. Dr. Clark had been calling for chemotherapy to possibly begin as early as January 2021.

44.    Since his diagnosis in July 2020, the Prison Administration Defendants have caused Mr. Miller to miss chemotherapy appointments repeatedly, reducing the dosage that Mr. Miller received to levels below what the oncologist deemed necessary to treat Mr. Miller's lung cancer, despite being aware of Mr. Miller's ongoing symptoms, his advanced stage lung cancer, and his prescribed chemotherapy schedule.

45.    Defendants Holt, Sauls, and Lewis did not ensure that adequate policies and systems were in place and adhered to so that Mr. Miller received this necessary regimen of treatment. Defendants Holt, Sauls, and Lewis knew that their failure to ensure adequate policies and systems were in place and adhered to created a substantial risk of serious harm to prisoners like Mr. Miller at GDCP.

46.    Mr. Miller and his legal team repeatedly contacted prison officials, including Defendant Smith and the Deputy General Counsel for GDC Bryan Wilson, who notified Defendant Lewis, to alert them to his appointments and the once-every-three-weeks regimen

which Dr. Clark prescribed as necessary to treat his lung cancer. Mr. Miller's inconsistent chemotherapy regimen caused him to receive only a fraction of the chemotherapy treatments he was ordered by his oncologists to receive, impacting the efficacy of the treatment and his responsiveness to treatment.

47.     On January 17, 2023, Mr. Miller received what would be his last cycle of chemotherapy *for over two years*. At the January 17 appointment, Dr. Clark scheduled the next cycle to be administered on February 14, 2023.

48.     Mr. Miller was not transported to his February 14, 2023, chemotherapy appointment as ordered by his oncologist, even though his lab results from February 3, 2023, showed abnormalities, including tumor markers. A week later, on February 21, 2023, GDCP records document Mr. Miller explicitly telling medical staff that he needed his chemotherapy. Nothing in Mr. Miller's medical records show that Dr. Clark, or any other oncologist, ordered the cessation of chemotherapy.

49.     Without warning or explanation, Mr. Miller received *no treatment* for his lung cancer from January 2023 until April 2025, against medical advice.

### c.  Complete Absence of Cancer Treatment

50.     Despite a clear diagnosis of stage IV lung cancer and written orders from Mr. Miller's treating oncologist that he continue to receive chemotherapy, Mr. Miller's already inconsistent cancer treatment was stopped without warning or explanation.

51.     In April and May of 2023, Mr. Miller was transported to see a different oncologist named Dr. Hollander. Mr. Miller only saw Dr. Hollander a total of two times.

52.     Both times, GDCP did not provide Dr. Hollander with Mr. Miller's complete medical records necessary to properly assess and treat Mr. Miller's lung cancer. Dr. Hollander

had to ask Mr. Miller for basic information about his cancer type, and which kinds of treatments he has received for his cancer.

53.    Despite admitting that she did not know what kind of cancer Mr. Miller had, Dr. Hollander told Mr. Miller that he had six months to one year to live.

54.    During these visits to Dr. Hollander at her clinic in Dublin, GA, she was in visibly poor health. Dr. Hollander was coughing and had open sores on her body. Even the transport officers expressed concern to her that she was not fit to be providing treatment. Their assessment was accurate. On May 26, 2023, days after Mr. Miller last saw Dr. Hollander, Dr. Hollander died of head and neck cancer at the Winship Cancer Institute in Atlanta.

55.    A Provider Progress Report from GDCP doctor and medical director Dr. Alexandra Fowler, on June 7, 2023, confirmed that Mr. Miller continued to be concerned about the delay in his care and noted that the doctor would "speak with oncologist to reschedule and start [treatment] urgently."

56.    On June 13, 2023, Mr. Miller's legal team again contacted Defendant Smith and then-Warden Antoine Caldwell, as well as Deputy General Counsel Wilson, about the fact that Mr. Miller's cancer treatment had still not resumed after more than six months' delay, that Dr. Hollander had been in poor health when treating Mr. Miller, that she passed away days after seeing him, and that Mr. Miller was still not receiving his medication regularly. Mr. Miller's legal team emphasized that this was a "life-threatening situation" and that Mr. Miller's cancer had likely spread in the six months without treatment.

57.    The following day, Mr. Wilson confirmed that Dr. Hollander had died and had never started Mr. Miller's treatment, writing that the medical director at GDCP was "not sure

what was the cause for that delay" in chemotherapy treatment. Mr. Wilson wrote that there was

an interim oncologist who would follow up with Mr. Miller on an "urgent" pending request.

58.     On June 22, 2023, Mr. Wilson informed Mr. Miller's legal team that a new doctor

had reviewed a recent CT scan from May and that there was "no disease progression indicated."

The only follow-up treatment plan mentioned was another CT scan scheduled for August 7,

2023. There was no reason provided for why treatment had been stopped between January and

June.

59.     As of August 16, 2023, Mr. Miller was still voicing concerns to GDCP medical

and administrative staff about the prolonged period without any treatment.

60.     A GDCP Chronic Care Report by Sharon McDonald, LPN, and Dr. Eric Fogam

from August 24, 2023, acknowledged Mr. Miller's lung cancer, instructing to "continue chemo."

No chemotherapy appointments were ever scheduled.

61.     On August 29, 2023, Mr. Miller was transported to meet yet another new

oncologist, Dr. Marco Ayulo, whose report lists the "chief complaint" as lung cancer, but also

mentions "prostate cancer." The only treatment plan listed was to "continue observation" and

"RTC 3 month."

62.     A GDCP summary of the August 29 visit summarizes the oncologist's findings,

noting that a follow up appointment was scheduled for November 28.

63.     In late October 2023, Mr. Miller was hospitalized for severe heart conditions.

While hospitalized, a CT scan was conducted, and the reviewing physician noted that the scan

showed numerous nodules still in his lungs, with possible metastasis.

64.     Despite GDCP physician records from November 24 confirming his November 28

oncology appointment, Mr. Miller was not transported to his November 28 oncology

appointment. Instead, he was double-booked for both cardiology and oncology appointments for the same day and only transported to the cardiology appointment. On November 29, a GDCP Provider Progress Note simply said to "follow up with cardiac and oncology for lung cancer" with a "f/u with lung specialist in 6 months."

65.    On February 1, 2024, GDCP Provider Progress Notes documented Mr. Miller wheezing from his lungs, but the provider notes stated "no further follow-up unless patient is symptomatic. No consults to be submitted."

66.    It was not until February 20, 2024, that Mr. Miller was seen by oncologist Dr. Ayulo for a 20-minute appointment—three months after his missed November appointment and six months since he had last seen, and first met, Dr. Ayulo. Dr. Ayulo's records still indicated both "lung cancer" and "prostate cancer." While the records confirmed yet again that Mr. Miller still had lung cancer, the plan of care was only for more CTs to be taken, to have the port flushed, and to have a follow up consultation on April 23.

67.    Mr. Miller was transported to his April 23, 2024 oncologist appointment with Dr. Ayulo, where no future treatment plan was discussed with Mr. Miller and Dr. Ayulo's understanding of Mr. Miller's lung cancer was still extremely limited. Dr. Ayulo's report continued to document "prostate cancer, lung cancer" and again listed the same plan of care as February. Upon information and belief, Mr. Miller did not have his port flushed or the additional scans needed to move forward with any cancer treatment.

68.    On July 19, Mr. Miller's pain level was listed as a constant "10 of 10" in his chest and leg, with the cause listed as lung cancer and spinal stenosis. The notes list that "chemotherapy was suspended." The only care plan listed was to "submit consult for oncology f/u."

69.     Mr. Miller was taken offsite on July 23, 2024 to see Dr. Ayulo. The oncologist asked Mr. Miller several times what type of cancer he had and incorrectly discussed prostate cancer, rather than lung cancer, despite GDCP records as recent as July continuing to note Mr. Miller's lung cancer diagnosis.

70.     Without any further treatment plan or documentation of updates on Mr. Miller's lung cancer status—and remaining confusion on whether he had prostate cancer—the GDCP notes summarizing next steps simply state "F/U with Dr. Ayulo 8/28/24 @ 10:00 AM."

71.     GDCP provider notes from September 5 summarized that even for internal health workers at the prison, the "treatment plan is unclear" from Mr. Miller's April 23 oncologist appointment, and also marked that Mr. Miller has a "h/o [history of] prostate cancer." To this date, prostate cancer has never been discussed with Mr. Miller.

72.     From the abrupt stopping of his chemotherapy in January 2023 to fall of 2024, GDCP medical staff reassured Mr. Miller *multiple times* that his lung cancer was being monitored, that it was stable and not growing, and there was no reason for chemotherapy treatment at the time, despite not having adequately updated scans and records from the oncologists to support those assurances.

73.     It was not until Mr. Miller was hospitalized for untreated pneumonia in September 2024 that hospital staff performed a CT scan and reported multiple lung nodules that "have increased in size and number" when compared to his December 2021 CT scan.

74.     Despite it being in his records and Mr. Miller being under their care, none of the Prison Administration Defendants or GDCP medical staff told Mr. Miller about the results of this scan and that his lung cancer had been progressing.

75.     GDCP physician provider notes in October 2024 indicate that staff was summarizing Mr. Miller's medical history and sending it to the Statewide Medical Director, Defendant Mardis.

76.     It was only after Mr. Miller provided the hospital report to his legal team at the end of October, that Mr. Miller was put on notice that the previous assurances about his lung cancer may have been inaccurate.

77.     Upon discovering the concerning report, on November 20, 2024, Mr. Miller's legal team contacted Deputy General Counsel Wilson and requested that Mr. Miller see an oncologist immediately and that updated scans be taken so that accurate treatment could follow. Mr. Miller's legal team emphasized that previous attempts to ascertain why chemotherapy had been halted went unanswered and this was a life-threatening situation that was being ignored.

78.     On the same day, Mr. Wilson replied only that the concerns had been forwarded to the Statewide Medical Director, who at the time was Defendant Mardis.

79.     Meanwhile, Mr. Miller had been asking GDCP physician Dr. Ethel Smith for clarification about his oncology treatment. On October 28, she told him that they didn't have his most recent oncologist notes, and that she would need those notes to request a follow up with the oncologist and order a scan.

80.     On November 22, Mr. Miller again discussed his concerns about his healthcare with Dr. Ethel Smith. Mr. Miller stated that, among other medical concerns, he had been under the impression that his cancer was stable, but was very alarmed now because the recent hospital scans showed that that was not the case. Dr. Smith told Mr. Miller that he would be visiting with a cardiologist once a year and an oncologist twice a year, with no explanation as to how that

differed from previous plans or why he would only be seeing an oncologist twice a year. Mr. Miller was told that one of these two oncologist visits would be occurring in December.

81.    Mr. Miller was transported to see a new oncologist, Dr. Thomas H. Cartwright, at the Anderson Cancer Center, on December 10, 2024.

82.    Dr. Cartwright was very concerned about Mr. Miller's lung cancer and explained to Mr. Miller that he could not understand why chemotherapy treatment had been stopped and that the present nodules were alarming.

83.    Dr. Cartwright's notes call Mr. Miller's records "complicated and confusing," noting that it appears Mr. Miller's oncologist had "[planned] to give him additional chemotherapy" and yet "since then he has not had any additional therapy that he is aware of."

84.    Despite the obvious urgency in treating Mr. Miller's growing lung cancer, Dr. Cartwright told Mr. Miller that the records and scans he had been provided by prison staff under Defendants' supervision were not sufficient to start a treatment plan. Dr. Cartwright indicated that he would need updated scans and Mr. Miller's full records before starting a treatment plan.

85.    Mr. Miller was then scheduled to have a follow-up appointment with another oncologist in the same practice, Dr. Moyosore Suleiman, on January 10. Instead, Mr. Miller's appointment was pushed out and rescheduled to February 3, 2025, with Dr. Cartwright.

86.    At the February 3 visit, Dr. Cartwright's notes confirm that Mr. Miller's cancerous nodules had increased in size since his October 2024 scan. His cancer was progressing, untreated.

87.    The next day, GDCP Provider Notes document that Mr. Miller was coughing up white phlegm.

88.     By February 6, there was an "urgent" referral request for Mr. Miller to see an oncologist again.

89.     On February 24, Mr. Miller met with offsite physician Dr. Khan after being referred by Dr. Cartwright for a biopsy. Dr. Khan reviewed Mr. Miller's scans and noted that there was an increase in his lung cancer nodules which was "concerning for progression of the disease."

90.     On February 27, GDCP Nurse Practitioner Neta Roby confirmed in internal notes that Mr. Miller has multiple masses in both lungs that were increasing in size and required biopsies. She also noted that it was "EXTREMELY hot" in medical with "no air circulating in the entire area to include treatment room."

91.     On March 13, Mr. Miller met with yet another oncologist in the Anderson Cancer Center, Dr. Katie McQueen Amaker. Her notes indicate that Mr. Miller was "lost to follow-up for scheduled imaging" until re-establishing care with Dr. Cartwright's practice in December 2024.

92.     By March 24, 2025, this new team of oncologists had Mr. Miller's goal of care as "disease control and prolongation of survival."

93.     Mr. Miller had his first chemotherapy treatment in almost *two and a half years* in late April 2025.

94.     Mr. Miller was again placed on a three-week chemotherapy schedule by his treating oncologist. Defendants again failed to ensure that he receive his chemotherapy as prescribed.

95.     Mr. Miller only received one successful chemotherapy treatment before his treatment regimen was disrupted.

96.     Mr. Miller was not transported to his May 2025 chemotherapy appointment because of Defendants' mismanagement of his blood sugar. As chronicled below, a premature administration of steroids by GDCP's medical staff, meant to be administered in the days before a chemotherapy treatment but administered instead over a week early when he already had steroids in his system from his previous treatment, caused Mr. Miller's blood sugar levels to skyrocket for weeks. Defendants Emmons, Tillman, and King were aware of Mr. Miller's dangerously high blood sugar levels, and yet failed to take any actions to control it.

97.     On May 27, Mr. Miller's legal team emailed Deputy General Counsel Wilson, concerned about the missed chemotherapy appointment and requesting an update on when the appointment would be rescheduled. Mr. Wilson replied that he would check with the State Medical Director (Defendant Mardis), but that Mr. Miller had monthly appointments scheduled through August.

98.     The following day, Mr. Wilson only confirmed what Mr. Miller's counsel already knew—that Mr. Miller's chemotherapy appointment had been cancelled due to his elevated blood sugar levels, which were so high he had to be sent to the emergency room. Mr. Miller's counsel again stressed the importance of Mr. Miller having his chemotherapy rescheduled and the need for Defendants to control Mr. Miller's blood sugar levels such that it would not interrupt Mr. Miller's cancer treatment. Mr. Miller's counsel also reported that Mr. Miller had been coughing up blood and had been experiencing blood in his stool for days, with no medical diagnosis or treatment. Mr. Wilson responded that he would not "deba[te] the appointments" and would call to have Mr. Miller's bleeding reviewed.

99.    Mr. Miller was never seen for coughing up blood or having blood in his stool. A week later, he was brought to the medical infirmary and asked to provide a stool sample. When Mr. Miller did, it was never picked up.

100.    Mr. Miller's May chemotherapy appointment was never rescheduled.

101.    Mr. Miller was finally brought to a second chemotherapy appointment on June 9, almost 6 weeks after the prior treatment—double the prescribed amount of time between treatments.

102.    On July 21, Mr. Miller was transported to and received his chemotherapy treatment as prescribed.

103.    As documented further below, from late June to present, GDCP stopped providing Mr. Miller his morphine medication without warning or without a change in his prescription, and for an indefinite amount of time. This caused Mr. Miller significant pain and discomfort, as the substitute medication he was provided was ineffective at treating his pain and caused additional symptoms such as intense nausea.

104.    On August 5, counsel for Mr. Miller reached out to Deputy Counsel Mr. Wilson, concerned that Mr. Miller would not be able to attend his upcoming chemotherapy appointment without additional medical attention for the symptoms he was experiencing, such as severe pain, difficulty breathing, and intense nausea. Counsel requested that Mr. Miller be seen by a doctor urgently, as Mr. Miller's sick call requests for a doctor had been ignored.

105.    On the same date, Mr. Miller responded that the email had been forwarded to the Statewide Medical Director, Defendant Mardis, with no assurance that Mr. Miller would be seen by a doctor.

106.    After learning that Mr. Miller had still not received additional medical treatment or been seen by a doctor, Mr. Miller's counsel again emailed Mr. Wilson on August 7, requesting that Mr. Miller be seen by any available doctor. Mr. Wilson again replied without reference to Mr. Miller seeing any medical professional.

107.    On August 8—a Friday—counsel for Mr. Miller contacted Mr. Wilson to emphasize that Mr. Miller's pain needed to be addressed promptly given his upcoming chemotherapy appointment, scheduled for the following Monday. Mr. Wilson only replied that Mr. Miller had been "educated" on the substitute medications and he would "as always" let the Statewide Medical Director, Defendant Mardis, know of the concerns.

108.    Mr. Miller's legal team also attempted to contact the acting Deputy Warden of Care and Treatment, Jamie Bethune, and left a message with GDCP staff requesting a call back. Deputy Warden Bethune never returned the call or followed up on Mr. Miller's care.

109.    On the same day, a GDCP nurse told Mr. Miller that the prison did not have the required steroid medication to give him prior to the appointment, which meant he would not be able to receive his chemotherapy.

110.    On Monday, August 11, Mr. Miller was not taken to his chemotherapy appointment.

111.    Mr. Miller was told by GDCP medical staff that he could not be taken to his chemotherapy appointment because the medication for the steroid shot he was required to be administered prior to the appointment was expired.

112.    Upon learning that he was forced to miss his chemotherapy treatment, Mr. Miller's legal team immediately contacted Mr. Wilson, insisting that Mr. Miller needed

consistent treatment for his progressing cancer and asking to be updated with a rescheduled appointment.

113.    Mr. Wilson responded that the Statewide Medical Director (Defendant Mardis) was aware that Mr. Miller did not receive his steroid injection, and was "addressing the issue" regarding the steroid and his missed appointment. Mr. Miller has not been provided a plan to reschedule his missed chemotherapy appointment.

**B.  Systemic Pattern of Medically and Constitutionally Deficient Medical Care for Other Serious Medical Conditions**

114.    Not only have Defendants failed to provide Mr. Miller with timely and appropriate cancer diagnosis, treatment, and monitoring, but Defendants have systematically and consistently failed to deliver Mr. Miller's medication as prescribed, causing him debilitating and unnecessary pain and cycles of cruel opioid withdrawals for years.

115.    Defendants have also refused to provide Mr. Miller with appropriate medical care for other serious, urgent, and/or chronic medical conditions such as pneumonia and chronic leg pain.

116.    Mr. Miller and his legal team have routinely raised his concerns about lack of medical care and inconsistent delivery of medication to Defendants through GDC Deputy General Counsel Wilson, and have raised concerns over the years directly to Defendants Beasley, Emmons, Tillman, Agbaosi, and Smith.

**a.  Inadequate Delivery of Medication Causing Repeat Opioid Withdrawal, Pain, and Suffering**

117.    Mr. Miller has been prescribed a number of medications during his time at GDCP. He has not received those medications and pain management treatments as prescribed, causing

him repeated pain and suffering—at times so extreme that he wanted to give up on pursuing his cancer treatment, in the hopes that his suffering could end sooner, once and for all.

118.    For over five years, Mr. Miller has not received his prescribed pain medicine on a regular, uninterrupted basis.

119.    Despite GDCP documentation of Mr. Miller's pain as a "10 of 10," and "chronic agony," Agency and Prison Administration Defendants have been deliberately indifferent for years to Mr. Miller receiving his necessary pain medication for chronic conditions like severe spinal stenosis, lung cancer, and his undiagnosed leg pain.

120.    Mr. Miller has chronic spinal stenosis, a condition characterized by severe pains in the back, thighs, and legs which seriously inhibits his mobility. Mr. Miller has been prescribed daily pain medication to make the condition manageable.

121.    In December 2019, the medical staff ordered a transcutaneous electrical nerve stimulation unit (hereinafter "TENS unit"): a therapeutic device needed to treat Mr. Miller's severe pain. The request was marked "urgent."

122.    Despite numerous reports and internal GDC medical requests documenting that a TENS Unit was still needed for Mr. Miller, as of the date of this filing, the medical staff has never provided the TENS unit to Mr. Miller.

123.    While the exact medication prescribed has changed over the years, Mr. Miller has been prescribed narcotics for his back pain since as early as 2019, when he signed a Narcotic Chronic Pain Management Agreement.

124.    Most recently, Mr. Miller has been on a prescription for Morphine since at least March 2022, both for cancer pain and "breakthrough" pain.

125.    Narcotic medications are well-known for their potential for addiction and serious side-effects if stopped abruptly.

126.    Prison Administration Defendants have repeatedly failed to ensure that Mr. Miller is provided his medication as prescribed. Mr. Miller has not received his prescribed narcotics for pain on a regular and uninterrupted basis, causing him intense pain and suffering from both the untreated pain from his underlying conditions, and the additional pain and suffering that is caused by repeated withdrawal from narcotics such as morphine.

127.    Among other symptoms, the withdrawal process which results from being taken on and off his morphine prescription without notice has caused Mr. Miller to be extremely weak, tired, irritable, sweaty, confused, jittery, restless, and in significant pain.

128.    Mr. Miller receives his prescription medications through a "pill call" process, during which medicines are distributed by medical staff at GDCP.

129.    Pill calls are supposed to occur at least once in the morning and once in the afternoon, or more frequently as required by specific prescriptions. However, pill calls for over the past two years have not been performed at regular hours, and the timing of pill calls have been so irregular that Mr. Miller has had no idea what time his medication will come, or if it will be delivered  at all. Often times, pill calls are missed entirely, or Defendants' staff have come to pill calls without Mr. Miller's medication, leaving Mr. Miller without his prescribed medication for days or even weeks at a time.

130.    Pill calls on weekends are often even more unreliable. There have been several instances where no pills were delivered to Mr. Miller for the entire weekend.

131.    While all of the reasons for the inadequate medication delivery are not known, several serious systemic problems are frequently to blame, including shortages of medical staff

to deliver the medication, shortages of security staff to escort medical staff to G-House (the tier where Mr. Miller is located), and medical staff allowing prescriptions to lapse and not be refilled.

132.    Mr. Miller and his legal team have been alerting GDCP staff and GDC Deputy General Counsel to issues in medication administration for years.

133.    For example, in May 2023, Mr. Miller's legal team emailed Deputy Counsel Mr. Wilson, then-Warden Caldwell, and Deputy Warden of Care and Treatment Defendant Smith, about Mr. Miller's lack of prescribed pain medication.

134.    Internal documentation by Dr. Fowler on May 2, 2023 indicates that Mr. Miller was reporting that he had been out of his morphine for several days, causing worsening and uncontrolled pain. Dr. Fowler confirmed that the morphine had been ordered but was not at the facility yet and had to educate him on the side effects of withdrawal and precautions to returning to the medication. Dr. Fowler had to write a physical prescription to take to a local pharmacy that same day so that Mr. Miller would not miss any more doses.

135.    From June to August 2023, a pattern continued of Mr. Miller going days at a time without medication, with nurses at pill call telling him they did not have his medication, or days where his medication was being delivered all at once, late in the day, rather than according to the prescription.

136.    The medication interruptions continued into the fall. For instance, on October 2, 2023, GDCP documentation noted that Mr. Miller had not received his prescribed morphine in at least three days and was in a "great deal of pain" from the lapse.

137.    By October 4, Mr. Miller had still not received his morphine medication, and Dr. Fowler advised that if he did not receive his medication that same day, Mr. Miller needed to be taken to the Emergency Room. After being told by the "pill room" that the medications would

arrive that day, Defendant Emmons and Defendant Smith and medical providers placed Mr. Miller in an observation room until he could receive his proper medication.

138.    On November 1, 2023, GDCP documentation noted that Mr. Miller was unable to receive his medications due to "security reasons," despite having just returned from the hospital for open heart surgery.

139.    On November 2, 2023, Mr. Miller continued to request his morphine pain medication. GDCP documentation notes that the nurse was unable to give Mr. Miller his medication due to "lock box keys and security."

140.    By November 6, 2023, Mr. Miller was still attempting to contact Dr. Fowler about missing doses of his morphine medication while trying to recover from open heart surgery in a GDCP infirmary room covered with feces and urine, without adequate medical staff to attend to him.

141.    On December 13, 2023, Mr. Miller's legal ream reached out to Defendant Smith, distressed that Mr. Miller had not been receiving his necessary morphine pain medication, despite still recovering from open heart surgery. The next day, Defendant Smith reported that Mr. Miller had now received only some of his morphine, but expected the rest to be delivered to the prison the next day.

142.    On January 10, 2024, Mr. Miller's legal team reached out to Defendant Smith and Deputy Counsel Mr. Wilson, concerned that there continued to be yet another lapse in the receipt of Mr. Miller's necessary medication. Mr. Miller had not received his prescribed morphine and had been informed by medical staff that he would not receive it until the next week at the earliest—translating to at least five days without his narcotic pain medication.

143.    Mr. Wilson responded later that day after discussing the issue with the Medical Director (at the time Defendant Lewis), only noting that the "reorder process" for his pain medication had been discussed with the contracting medical provider, Wellpath, and that Mr. Miller would receive the "control medication for pain today." Mr. Miller's legal counsel again emphasized the importance of receiving his morphine regularly.

144.    In March 2024, Mr. Miller was still not receiving his pain medications regularly.

145.    By August 2024, Mr. Miller was experiencing weeks of pain due to his medications not being delivered.

146.    On August 20, 2024, Mr. Miller's legal team again reached out to Defendant Smith and Mr. Wilson to notify them that Mr. Miller had not received his prescribed pain medications since the prior week. Mr. Wilson responded that Defendant Smith was no longer at GDCP, and that Defendant Emmons checked with "medical" and Mr. Miller's extended release morphine medication "ran out" but that Mr. Miller was receiving a different medication instead—a medication that he was already prescribed in addition to morphine. Counsel for Mr. Miller replied that the substitute medication was not an adequate substitute, emphasizing that "we seem to go through this every few months, and [morphine] is way too powerful a drug to be receiving so inconsistently."

147.    Mr. Miller was unable to participate in his scheduled legal visit on August 21, 2024 because he was in so much pain from his lack of medication. The same day, GDCP documentation notes that Mr. Miller had been out of his morphine medication for at least four to five days and that an "apology" was given to him "about the situation with him [sic] medication" and that he was "advised every effort is being made to get medication to him today."

148.    By September 5, Mr. Miller was still not consistently receiving his medicine. For example, that day, he had not received any medication, and the day before, he only received half of his prescribed pills.

149.    The delivery of Mr. Miller's medication still did not improve. For example, Mr. Miller received no medications at all on Friday, September 13; received only half of his medications on Saturday, September 14; received only half of his medications on Sunday, September 15; received all of his medications on Monday, but they were delivered all at once late in the day, rather than half in the morning and half in the evening. Defendant Tillman was making the rounds with nurses during this time.

150.    On multiple occasions throughout 2024, including during this September time period of inconsistent medication delivery, GDCP nurses often handed stacks or containers of prescription pills to corrections officers to pass out to prisoners because they did not want to come into G-House. Often, there were medications missing from those deliveries, including Mr. Miller's.

151.    In September 2024, following hospitalization for pneumonia, Mr. Miller was not provided with his proper prescription of antibiotics or cough suppressant upon returning to GDCP. After four days of asking for his medication, one nurse simply provided him with a "blister pack" of multiple days' worth of medication at one time—which was not what his prescription called for. The medications given to him were also not the correct dosage, but instead were larger pills that the nurse instructed Mr. Miller to break in half, telling him it was the best she could do.

152.    Then, in October 2024, there were weeks where Mr. Miller was not provided pain medication, including his prescribed Neurontin (gabapentin) and Albuterol. He was given no

explanation for the lapse. Internal GDCP documentation from October 28 documents Mr. Miller's continued complaints about lack of pain medication and posits that while his prescriptions were current, it may be that the controlled medication form had expired.

153.    By October 29, 2024, Mr. Miller had not received his prescribed Neurontin (gabapentin) in multiple weeks. When he asked GDCP physician Dr. Marvin Lee about his lack of medication, all Dr. Lee could provide was that he wasn't sure why he hadn't received the medication but that it had been re-ordered.

154.    On November 5, GDCP Provider notes document a continued lapse in Mr. Miller's pain medication.

155.    Defendants' inability to provide Mr. Miller with his prescribed pain medication has continued into 2025.

156.    For example, on Thursday, January 23, Mr. Miller went at least two days without any pain medication, partially because on that Wednesday, no nurses came to work at GDCP. By that Sunday, January 26, Mr. Miller was only receiving half doses of his pain medication. On Monday, January 27, Mr. Miller's legal team reached out again to GDC Deputy General Counsel, Bryan Wilson. Mr. Wilson replied that Defendant Mardis was checking into the medication issue.

157.    The lack of medication and uncontrolled pain caused Mr. Miller to have to cancel a legal visit. On Wednesday, January 29, Mr. Miller reported still receiving only half doses of his medication because the prescription had not been re-ordered in time.

158.    On February 26, Mr. Miller's legal team again contacted Mr. Wilson, alerting him that Mr. Miller was again told that the prison had no morphine for him and he was going on his second day without any morphine. Mr. Miller's counsel expressed that the continued lapses were

unacceptable and requested Mr. Wilson let the Medical Director (Defendant Mardis) know, which he replied that he would.

159.    On February 27, GDCP records noted that Mr. Miller had gone three days without his morphine.

160.    On February 28, Mr. Wilson replied to update that the Statewide Medical Director (Defendant Mardis) had spoken to the Medical Director at GDCP and the morphine "was ordered." At this point, Mr. Miller had gone five days without his morphine and was only assured that it had been *ordered*. In a later email, Mr. Wilson assured Mr. Miller's legal counsel that "Dr. Mardis has the new Medical Director at GDCP and Regional Medical Director supervising Mr. Miller's case."

161.    On Wednesday, March 26, a pill call nurse told Mr. Miller that she only had two days' worth of medication, so he would not be able to receive his medications on Friday.

162.    By March 31, Mr. Miller was going days without pain medications and in excruciating pain. His legal team again reached out to Deputy General Counsel Wilson. Mr. Wilson only responded that Mr. Miller was being given alternative medication until his medication came in "today or tomorrow," and that Defendant Mardis was "monitoring" the situation. Mr. Miller's morphine did not arrive until April 3.

163.    Continuing on in April 2025, Mr. Miller was not receiving his pain medications and was in so much pain that he did not know if he would be able to physically attend his necessary oncology appointments.

164.    On April 4, Mr. Miller's legal team emailed Deputy General Counsel Wilson about the lack of necessary pain medication after communications with Mr. Miller indicated that

he was in extreme pain and distress. It took an additional phone call the same day to the

Warden's secretary before Mr. Miller was purportedly brought his medication.

165.    Starting in May 2025, after being given an extra and premature dose of steroids

before his second scheduled chemotherapy treatment, Mr. Miller's blood sugar skyrocketed and

remained extremely high for over a month and prevented him from attending his next scheduled

chemotherapy appointment.

166.    From May 8 to approximately mid-June, Mr. Miller's blood sugar levels were

consistently in the 300s, 400s, and even 500s—despite those numbers being far outside the

accepted range of blood sugar for anyone, and being associated with numerous painful and

uncomfortable symptoms.

167.    Mr. Miller had no way to check his own levels or administer insulin to himself if

his levels were getting too high.

168.    Mr. Miller suffered weeks of symptoms related to his extreme blood sugar levels

such as dizziness, fatigue, extreme discomfort, irritability, and spots in his vision.

169.    GDCP medical staff did not check his blood sugar levels frequently enough, but

when they did, there were multiple times when they did administer insulin, but it did not control

the extreme levels. Despite knowing his blood sugar levels were still extremely high, GDCP

medical staff took no further steps to control them.

170.    Not only were Mr. Miller's mismanaged blood sugar levels dangerous and painful

on their own, but they also impeded his ability to get other life-saving treatment—chemotherapy.

171.    Despite being scheduled for his second chemotherapy treatment on May 20, 2025,

Mr. Miller instead had to be taken to the emergency room because his blood sugar levels were

too elevated. When Mr. Miller's legal team then emailed Deputy General Counsel Wilson asking

if and when he would be rescheduled for the chemotherapy Mr. Miller missed, they were only

told that he has monthly appointments and could not be provided specific dates for appointments.

172.    Mr. Miller was never taken to a second chemotherapy appointment to make up for

his missed May 20 appointment.

173.    It was not until Mr. Miller saw his treating oncologist in June that she noticed the

alarming blood sugar levels and changed Mr. Miller's treatment regime to correct the levels.

174.    The horrors of Mr. Miller's inadequate medicine delivery have continued up to

the filing of this document.

175.    On June 25, Mr. Miller alerted his legal team that he was again out of his

morphine pain medication, both the extended release and immediate release. He was concerned

that he would have to start another chemotherapy appointment in pain.

176.    On June 26, Mr. Miller's counsel sent Deputy General Counsel, Mr. Wilson, an

email alerting him that Mr. Miller's pain medication had lapsed again and needed to be resolved

urgently so that it didn't cause an additional interruption in his chemotherapy regimen. Mr.

Wilson said he did not "believe that is the case based on an update [he] received last week," but

would check into it.

177.    Mr. Miller's legal team followed up the next day, to which Mr. Wilson replied

that Mr. Miller's medication had been on back order and he was being provided a substitute

medication until the back-ordered medication came in.

178.    Mr. Miller was only given the substitute medication, a form of oxycodone, on

Saturday and Sunday, June 28 and 29.

179.    After his chemotherapy appointment on Monday, June 30th, Mr. Miller was still in so much untreated pain on Tuesday, July 1 that he was not able to be transported to receive the steroid shot he is supposed to receive the day after each chemotherapy administration.

180.    At that time, Mr. Miller had only received a fraction of a substitute for his required morphine and was in so much pain that he expressed a desire to give up his treatment altogether so that his suffering would end.

181.    The substitute medication provided in place of Mr. Miller's prescribed morphine was not adequate. It did not effectively alleviate his pain and caused other symptoms, such as intense nausea.

182.    The inconsistent delivery of his substitute pain medication continued throughout the week. At some point that weekend, the Director of Nursing at GDCP physically showed him a pack of morphine that was at GDCP, but told him they could not give it to him because of the expiration date on his prescription.

183.    Despite this, Mr. Miller reported receiving some morphine that weekend, July 5 and 6, and then being placed back on the substitute medication of oxycodone.

184.    Mr. Miller has made multiple sick call requests and verbal pleas to GDCP medical and corrections staff, including to Defendant Beasley, to see a doctor about the intense and negative symptoms he has had from the abrupt cessation of his morphine, to no avail.

185.    From Monday, August 4, to Wednesday, August 6, Mr. Miller reported that GDCP medical staff had started giving him a second type of oxycodone in hopes that it would help with his unmanaged pain. By Thursday, August 7, GDCP nurses were telling him they could no longer give him the additional medication because it was expired.

186.    As of August 5, Mr. Miller's symptoms included chest pains, intense lethargy, shortness of breath, inability to move, and intense nausea. Mr. Miller's legal team contacted Deputy General Wilson to express concern for Mr. Miller and highlight his many ignored sick calls regarding his symptoms and suffering. Mr. Miller's counsel also asked for an estimate of when Mr. Miller's morphine prescription would be available again, as the substitution was only supposed to be temporary and at this point had been ongoing for a month and a half.

187.    Mr. Wilson replied only that he had forwarded the concerns to the Statewide Medical Director, Defendant Mardis, and was unsure if they would be able to answer when the morphine would be back in stock. By August 7, Mr. Wilson only updated that the status of the backordered morphine "remains the same."

188.    On August 8, Mr. Miller's counsel again emailed Mr. Wilson, emphasizing the need for Mr. Miller to be seen by a medical professional to address his pain, before his chemotherapy appointment.

189.    Mr. Wilson replied that Mr. Miller had been "educated" on the substitute medications, but that he would let the Statewide Medical Director, Defendant Mardis, know of the concerns. Mr. Miller was still not seen by a doctor.

190.    On August 11, Mr. Miller's counsel emailed Mr. Wilson again, emphasizing that Mr. Miller needed consistent and adequate pain management and was suffering. Mr. Miller's counsel also raised concerns about the expired substitute medication, and the expired steroid medication which prevented Mr. Miller from attending his August chemotherapy appointment. Mr. Wilson acknowledged that Mr. Miller had not received the proper steroid injection and that the Statewide Medical Director, Defendant Mardis, was addressing the issue – but said he did not know anything about medications being expired.

191.    Mr. Miller is still being told that his prescribed morphine is on an indefinite backlog and is being treated with the same substitute medication which has been inadequate in addressing his pain and has instead caused him additional symptoms for over two months.

192.    Mr. Miller is now in so much pain and discomfort from the absence of his morphine pain medication that he has again expressed a desire for his illness to overtake him so that the constant agony would stop.

193.    Defendants Beasley, Emmons, Tillman, Smith, Lewis, and Mardis are all aware that Mr. Miller's medications are necessary and yet have failed to ensure that his prescriptions not lapse, causing him years of intense pain and suffering.

194.    Time and time again, Defendants have been put on notice that Mr. Miller is not receiving his necessary prescription medication and that the failure to do so has resulted in in extreme pain and suffering, and have exhibited deliberate indifference to Mr. Miller's serious medical needs by failing to ensure he receives his medications as prescribed and in a timely manner.

195.    Mr. Miller has been routinely subjected to the torture of battling multiple chronic and extremely painful conditions without his pain medication for days or weeks at a time—often with the additional pain of withdrawing from narcotic medication at the same time.

### b.  Inadequate Treatment for Other Serious Conditions

196.    Not only have Agency and Prison Administration Defendants failed to provide Mr. Miller with medication and pain management for the medical conditions documented above, but they have also refused to provide him—or been extremely delayed in their provision of— attention or treatment for other incredibly serious conditions such pneumonia and debilitating leg pain.

### i. Pneumonia

197.     In mid-September 2024, Mr. Miller suffered from an illness which caused him serious symptoms, including high fever, lack of appetite, fatigue, hallucinations, difficulty breathing, and coughing up phlegm. For many days, he could not leave his bed.

198.     Every day, GDCP security and nursing staff saw the severe state that Mr. Miller was in. Some Prison Administration Defendants, such as Defendant Tillman, accompanied nurses to G-House, the area of Mr. Miller's cell, during this time.

199.     Mr. Miller made verbal pleas for medical attention to all of the staff that passed his cell. One nurse commented that it sounded like COVID-19, but did not take him to the infirmary or give him any diagnostic testing.

200.     When physically able, Mr. Miller also submitted multiple sick call requests, but was never visited by a physician and was not taken to the GDCP infirmary for diagnosis or care.

201.     Finally, on September 20, Mr. Miller was brought to the GDCP infirmary where he was seen by a doctor. At that point, Mr. Miller's illness had progressed untreated to such a serious level that he had to be taken to the emergency room for further evaluation and was ultimately hospitalized, where he was diagnosed with pneumonia and a urinary tract infection.

202.     While at the hospital, Mr. Miller was given prescription antibiotics. Once he returned to GDCP, he was not given his prescribed antibiotics or cough suppressant until at least four days afterwards—and even then, not in compliance with the prescription.

203.     When Mr. Miller confronted Defendant Tillman about the lack of adequate medication delivery and needing to be taken to the infirmary, Mr. Tillman told Mr. Miller that the prison did not have enough staff to take him to the infirmary.

204.    Mr. Miller was subjected to unnecessary pain and suffering before and after being hospitalized for his condition due to the constitutionally deficient policies, practices, actions, and inactions of Defendants.

### ii.  Severe, Chronic Leg Pain

205.    Mr. Miller has been suffering from severe and untreated leg pain and leg numbness since at least early 2024, which has progressed untreated to the point that he is dependent on a wheelchair for mobility.

206.    Mr. Miller has notified GDCP staff, including Defendants Tillman and Emmons, of his severe leg pain.

207.    When Mr. Miller first alerted GDCP medical staff to his severe leg pain around January 2024, GDCP medical staff suggested he may need to see a podiatrist or other leg/foot specialist and a vein specialist.

208.    GDCP Provider Progress Notes show that "acute embolism and thrombosis of deep vein in lower [extremity]" was observed as an acute issue on January 9.

209.    On January 23, an outside provider conducted an ultrasound of his "left lower extremity," finding normal vein flow and no evidence of deep venous thrombus.

210.    Without a diagnosis or treatment, Mr. Miller submitted sick calls about his leg pain, including on April 26, 2024, in which he requested to be seen at the medical infirmary about it.

211.    By May 6, GDCP records document that Mr. Miller was complaining of pain in his right hip radiating down his leg. Mr. Miller was only provided ibuprofen.

212.    GDCP documentation on May 8 reports that Mr. Miller was feeling "8 out of 10" pain in his right leg. The provider ordered an ultrasound of his right leg, with follow-up to occur once the results came back.

213.    By June 27, 2024, Mr. Miller was submitting more sick calls, stating "I have told everyone about my leg pain [and no one] has took a look at it. I need to be seen I can't walk the pain is up to butt!"

214.    On July 19, GDCP records document that Mr. Miller told medical staff he was supposed to see a specialist about his right leg pain and hadn't, and that his pain was worsening. His pain was assessed as a "10 out of 10," with radiating pain and numbness and tingling in his feet. No follow up care for his leg pain was prescribed.

215.    By September 5, 2024, GDCP records note that Mr. Miller had to use a wheelchair because he was too tired to walk from the dorm to the cafeteria, and was still experiencing right leg numbness.

216.    In October, Mr. Miller filed one of many grievances about his untreated leg pain, describing it as "excruciating and debilitating."

217.    As of November 2024, his leg swelling was so severe that he could not pull up his compression socks all the way. His many sick calls over months about his leg swelling went unanswered.

218.    On November 25, a GDCP Provider Report categorized Mr. Miller's wheelchair mobility issues as a chronic care condition, but no treatment plan was specified.

219.    Mr. Miller's severe leg pain continued into 2025, with Mr. Miller reporting his pain to GDCP staff and his legal team repeatedly, until at least April 2025.

220.    Mr. Miller has still not seen a leg or foot specialist or received proper treatment for his undiagnosed leg condition. He is still dependent on a wheelchair and in daily pain.

## CLAIM FOR RELIEF

### Count I:

### VIOLATIONS OF EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983

### Deliberate Indifference to Serious Medical Needs

221.    The medical care provided to Mr. Miller at GDCP falls far beneath constitutional standards, resulting in his unnecessary pain and suffering, grave emotional and psychological injury, and the exacerbation of existing medical conditions.

222.    Mr. Miller was diagnosed with lung cancer in 2020 and was ordered to begin chemotherapy in 2021. All of the Defendants have worked for GDC and been in positions tasked with ensuring Mr. Miller's safety and health since he has been diagnosed with lung cancer and has been prescribed treatment with chemotherapy.

223.    Defendants Mardis, Lewis, Beasley, King, Roberts, Emmons, Tillman, Smith, and Agbaosi had direct knowledge of Mr. Miller's serious medical needs and the substantial risk of harm if left untreated because: a) Mr. Miller or his legal team sought treatment repeatedly, through verbal and written requests directly to Defendants Beasley, Emmons, Tillman, Agbaosi, and Smith; b) Mr. Miller's legal counsel repeatedly notified the Deputy General Counsel of Mr. Miller's need for medical care and treatment for *years*, who then informed Defendants Mardis and Lewis and the Prison Administration Defendants personally;[2] c) Mr. Miller's symptoms, such as coughing up blood, calling out in pain, and being reliant on a wheelchair due to extreme

---

[2] Mr. Wilson told counsel that he should be the point of contact for counsel's concerns.

pain, were visible to the Prison Administration Defendants; d) Mr. Miller's cancer, treatment plans, and years of symptoms, including pain levels reaching "10/10" and characterized as "agony" due to repeated lapses in his narcotic pain medication, were documented in Mr. Miller's medical and institutional records, which were viewed by all of these Defendants as part of their job responsibilities.

224.    Even a layperson could have recognized the need for immediate and consistent medical treatment to prevent serious harm or death to Mr. Miller.

225.    Rather than providing Mr. Miller with prompt and appropriate care, all Defendants engaged in practices that recklessly disregarded Mr. Miller's constitutional rights.

226.    Those practices include but are not limited to:

(a) Routinely delaying or denying evaluations, treatment, and access to appropriate medical care both within and outside of GDCP;

(b) Failing to provide adequate access to, and prompt responses to, sick call requests;

(c) Declining to provide medically necessary treatments, including medication, medical devices, screening tests, and chemotherapy;

(d) Failing to maintain an adequate number of security and medical staff to ensure prisoners receive their medications consistent with their prescriptions and in a timely manner;

(e) Failing to provide medication as prescribed;

(f) Failing to maintain an adequate supply of medication to deliver it in accordance with prescriptions;

(g) Failing to maintain a sufficient number of qualified medical personnel such as physicians and nurses, such that some medical tasks are performed by unqualified individuals including corrections officials, or never performed at all;

(h) Failing to maintain a sufficient number of security staff to transport Mr. Miller to his medical appointments or to request attention and care in times of medical need; and

(i) Failing to create and maintain accurate and up-to-date medical records and failing to ensure that Mr. Miller's medical records are readily available to all of his medical providers.

227.     Defendants are aware of but have failed to address the risks of serious harm caused by their policies and practices. These policies and practices were planned and controlled by the Agency Defendants. Each of the policies and practices were then implemented by or under the direct supervision of the Prison Administration Defendants.

228.     As Assistant Commissioners, Defendants Holt and Sauls' customs and policies—as well as failure to monitor the safety and care of Mr. Miller, with which they are tasked—have resulted in a deliberate indifference to Mr. Miller's constitutional rights. Defendants Holt and Sauls had direct knowledge of the above systemic failures, unconstitutional conditions at GDCP, and numerous instances of constitutionally deficient medical care from staffing reports, internal and external audits, incident reports, and communications to the Deputy General Counsel.

229.     The Agency Defendants were aware of, and acquiesced to, the substantial risk of serious harm posed by the Prison Administration Defendants' failure to provide Mr. Miller with constitutionally-adequate medical care. Through incident reports, audits, staffing reports, litigation, and written communication from Mr. Miller's counsel, the Agency Defendants had

ample notice of the irreparable harm GDCP prisoners suffered and would continue to suffer from the lack of constitutionally adequate medical care absent intervention. Yet they knowingly failed to respond to the documented harms and the ongoing substantial risk of serious harm to GDCP prisoners. The Agency Defendants did not ensure that adequate policies and systems were in place and adhered to so that Mr. Miller received this necessary regimen of treatment. The Agency Defendants were in a position to hire and retain more security, care and treatment, and medical staff but knowingly failed to take adequate steps to do so. The Agency Defendants knew that their failure to ensure adequate policies and systems were in place and adhered to created a substantial risk of serious harm to prisoners like Mr. Miller at GDCP.

230.    The high vacancy rate at GDCP and the consequences of chronic understaffing for people needing medical care at GDCP were obvious to all Defendants. All Defendants were aware that GDCP's chronic understaffing created a substantial risk of serious harm to prisoners' serious medical needs because it meant there was insufficient staff to respond to verbal and written requests for medical treatment, to transport prisoners to on-site and off-site medical appointments, and insufficient staff to deliver timely and constitutionally-adequate medical care. Defendants Sauls, Holt, Emmons, and Beasley had direct knowledge of the shortages in medical and security staffing and the impact of inadequate medical staffing on the provision of healthcare at GDCP through numerous reports provided to them. As one example, the 2024 System-Wide Assessment of GDC Report explicitly warned that vacancy rates at 20 GDC prisons—including GDCP—had reached "emergency levels," that such critically low staffing would make it impossible for GDCP to maintain safe and secure operations and unable to comply with policy requirements difficult, and that "due to intermittent supervision, there is no consistent way to notify staff if a medical emergency […] requiring assistance occurs." Further, Defendants

Beasley, Emmons, King, Roberts, Tillman, Agbaosi, and Smith all have first-hand experience with the understaffing at GDCP, and have seen first-hand how it has prevented Mr. Miller from receiving the medical care he needed. All Defendants knowingly failed to ensure that adequate staff were available to provide constitutionally-adequate medical care to Mr. Miller.

231.    Defendants Beasley, King, Roberts, Emmons, Tillman, Agbaosi, and Smith all had direct knowledge through reports and first-hand experience of the inability of Mr. Miller and other incarcerated persons at GDCP to properly access Health Service Request Forms and to obtain and submit grievance forms, causing further disruptions to his necessary medical care.

232.    Defendants Mardis, Lewis, Beasley, King, Roberts, Emmons, Tillman, Agbaosi, and Smith all had direct knowledge of the routine delays and denials of Mr. Miller's necessary health care and interruptions in medication through reports, medical documentation, and direct communications with Mr. Miller or his legal team.

233.    Despite Mr. Miller's repeated pleas for medical care and various medical orders from professionals to treat him, and despite the obviousness of these medical conditions and the need for immediate and thorough treatment, Defendants have been deliberately indifferent to the substantial risks created by their knowing failure to provide minimally adequate medical care to Mr. Miller.

234.    Each Defendant had notice and was actually aware of Mr. Miller's serious medical needs, and knew or should have known the risk of harm to Mr. Miller if he did not receive diagnosis, treatment, or medication.

235.    Each Defendant has routinely and repeatedly failed to take steps to provide Mr. Miller proper medical care or access to medical care, violating the Eighth and Fourteenth Amendment prohibition against cruel and unusual punishment.

236.    Defendants' medically and constitutionally intolerable acts and omissions were done with reckless indifference to Mr. Miller's rights and wellbeing and have proximately caused an immeasurable amount of pain and suffering and further injury to Mr. Miller.

237.    Harms of failing to respond to Mr. Miller's serious medical needs, such as progression of stage four lung cancer due to sporadic and then completely cancelled chemotherapy, were reasonably foreseeable consequences.

238.    If not for the actions and inactions of every Defendant named, Mr. Miller would not have gone through intense pain and suffering due to missed necessary chemotherapy treatments; dozens of cruel opioid withdrawals; suffering through his chronic and potentially fatal condition of lung cancer without medication; or the mental anguish of not knowing whether his cancer may not have progressed to this point with proper care.

239.    Defendants acted under the color of state law when they knowingly failed to respond reasonably to Mr. Miller's serious medical needs.

240.    Accordingly, Mr. Miller seeks compensatory and punitive damages and injunctive declaration holding Defendants' acts and omissions in violation of the Eighth and Fourteenth Amendments and injunctive relief compelling Defendants to immediately provide Mr. Miller with constitutionally adequate medical care, including consistent delivery of his medication and consistent chemotherapy.

## PRAYER FOR RELIEF

Mr. Miller respectfully prays that this Court:

    **a.**  Assume jurisdiction over this action;

    **b.**  Grant Mr. Miller a trial by jury;

   **c.** Declare that the acts and omissions by Defendants described herein violated Mr. Miller's rights under the Constitution and laws of the United States;

   **d.** Grant permanent injunctive relief requiring Defendants to implement constitutionally adequate procedures to protect Mr. Miller's health and treat his current medical conditions;

      iii. Require Defendants to provide chemotherapy as prescribed by his treating oncologist;

      iv. Require Defendants to provide adequate nursing and security staffing such that Mr. Miller's medications and treatments are not delayed or refused due to lack of staffing; and

      v. Require Defendants to provide Mr. Miller his prescribed medications according to prescription, without interruption.

   **e.** Enter judgment in favor of Mr. Miller and against each Defendant for all damages allowed by law, including, but not limited to:

      vi. Compensatory damages for the full value of the quality of life and health Mr. Miller would have had if treated for the multiple untreated medical conditions, pain and suffering, and physical injuries;

      vii. Nominal damages;

      viii. Punitive damages;

      ix. Reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988(b) & (c) and as otherwise allowed by law; and

      x. Order such additional relief as this Court may deem just and proper.

Respectfully submitted,

Anna Arceneaux (Ga. 401554)
Victoria Olender Hellstrom (Ga. 168312)
Georgia Resource Center
104 Marietta Street, NW, Suite 260
Atlanta, Georgia 30303
(404) 222-9202

Mark Begnaud (Ga. 217641)
Michael J. Eshman (Ga. 365497)
Eshman Begnaud, LLC
315 W. Ponce De Leon Avenue, Suite 775
Decatur, Georgia 30030
(404) 665-9601

*Attorneys for Michael Miller*