## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

MICHAEL MILLER,                          :
                                         :
                Plaintiff,        :
                                         :        NO. 5:25-cv-00356-TES-CHW
        VS.                       :
                                         :
Assistant Comm'r AHMED                   :
HOLT, *et al.*,                          :        PROCEEDINGS UNDER 42 U.S.C. § 1983
                                         :        <u>BEFORE THE U.S. MAGISTRATE JUDGE</u>
            Defendants.       :
                         :

## <u>ORDER</u>

Plaintiff Michael Miller, a prisoner in the Georgia Diagnostic and Classification Prison ("GDCP") in Jackson, Georgia, filed a civil rights complaint pursuant to 42 U.S.C. § 1983. ECF No. 1. Miller is represented by counsel, has paid the full filing fee, and has effected service on all defendants. On preliminary review, Plaintiff will be allowed to proceed on his Eighth Amendment claim for deliberate indifference to serious medical needs against all Defendants.

### PRELIMINARY REVIEW OF PLAINTIFF'S COMPLAINT

I.    <u>Standard of Review</u>

The Prison Litigation Reform Act directs courts to conduct a preliminary screening of every complaint filed by a prisoner who seeks redress from a government entity, official, or employee.[1] 28 U.S.C. § 1915A(a). The Court must dismiss a prisoner complaint if it

---

[1] While it does not appear the Eleventh Circuit has addressed the issue, at least one other Circuit Court has determined that district courts may screen all civil actions brought by

"(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

A claim is frivolous if it "lacks an arguable basis either in law or in fact." *Miller v. Donald*, 541 F.3d 1091, 1100 (11th Cir. 2008) (citations omitted). On preliminary review, the Court may dismiss claims that are based on "indisputably meritless legal" theories and "claims whose factual contentions are clearly baseless." *Id.* (citations omitted). A claim can be dismissed as malicious if it is knowingly duplicative or otherwise amounts to an abuse of the judicial process. *Daker v. Ward*, 999 F.3d 1300, 1308, 1310 (11th Cir. 2021) (affirming dismissal of duplicative complaint "in light of [prisoner's] history as a prolific serial filer").

A complaint fails to state a claim if it does not include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (citations omitted). In other words, the complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Id.* at 556. "Threadbare recitals of the elements of a

---

prisoners, even if the prisoner is represented by counsel and has paid the full filing fee, as is the situation in this case. *In re Prison Litig. Reform Act*, 105 F.3d 1131, 1134 (6th Cir. 1997).

cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

To state a claim for relief under § 1983, a plaintiff must allege that (1) an act or omission deprived him of a right, privilege, or immunity secured by the Constitution or a statute of the United States; and (2) the act or omission was committed by a person acting under color of state law. *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). If a litigant cannot satisfy these requirements or fails to provide factual allegations in support of his claim or claims, the complaint is subject to dismissal. *See, e.g.*, *Bingham v. Thomas*, 654 F.3d 1171, 1176-77 (11th Cir. 2011) (affirming dismissal of certain claims at preliminary screening because prisoner failed to allege sufficient facts to show a violation of his rights), *abrogated on other grounds by Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc).

## II.    Factual Allegations

Plaintiff names the following Defendants:    (1) Ahmed Holt, Assistant Commissioner of the Facilities Division of the Georgia Department of Corrections ("GDC") since 2019; (2) Jack "Randy" Sauls, Assistant Commissioner of the Health Services Division of GDC since 2016; (3) Dr. Marlah Mardis, Statewide Medical Director of GDC since April 2024; (4) Sharon Lewis, Statewide Medical Director of GDC prior to her retirement in 2024[2];  (5) Jacob Beasley, GDCP Warden since July 2025; (6) Shawn Emmons, GDCP Warden from July 2023 until July 2025; (7)  Sheneca King, Deputy

---

[2] Holt, Sauls, Mardis, and Lewis are sometimes collectively referred to as the "Agency Defendants."

Warden of Security at GDCP since January 2022; (8) Timothy Roberts, Deputy Warden of Security at GDCP since June 2024; (9) Alexander Tillman, Deputy Warden of Care and Treatment at GDCP from July 2024 until July 2025; (10) Mark Agbaosi, Deputy Warden of Security at GDCP from December 2022 until February 2025; (11) LaChesha Smith, Deputy Warden of Care and Treatment at GDCP from December 2022 until July 2024.[3] ECF No. 1 at 4-6.

Plaintiff suffers from several serious illnesses,[4] including advanced-stage lung cancer, which was first diagnosed in July 2020 following "six months of severe symptoms . . . ; concerning test results; months-long delays in diagnostic medical appointments; and pleas for 'urgent' diagnosis and treatment by medical staff and [Plaintiff's] legal team." *Id*. at 8. Dr. Clark, Plaintiff's first oncologist, recommended that Plaintiff begin a chemotherapy regime as early as January 2021 and continue the regime every three weeks. *Id*. at 15. It, however, took over one year for the Georgia Department of Corrections

---

[3] Beasley, Emmons, King, Roberts, Tillman, Agbaosi, and Smith are sometimes collectively referred to as the "Prison Administration Defendants."

[4] In addition to advanced-stage lung cancer, Plaintiff currently has, or had in the past, several other serious medical conditions. He has suffered since 2024 from severe, chronic, and undiagnosed leg pain and numbness, "which has progressed untreated to the point that he is dependent on a wheelchair for mobility." ECF No. 1 at 42. As discussed below, Plaintiff and his legal team have notified several of the Prison Administration Defendants about the leg pain on numerous occasions. *Id*. Despite complaining about the severe pain for years and its progression to the point that Plaintiff is forced to use a wheelchair, he has never received a diagnosis or any type of specialized treatment for the condition. *Id*. at 42-44. Plaintiff frequently is forced to suffer from severe withdrawal symptoms and pain caused by Defendants' failure to give his prescribed morphine and/or other pain medication on a regular and consistent basis. *Id*. at 3, 27-40. Also, discussed in more detail below, Plaintiff was diagnosed with pneumonia and a urinary tract infection in mid-September 2024. *Id*. at 41.

("GDC") to begin treatment, despite written orders from Dr. Clark and numerous requests from Plaintiff's legal team. *Id*. at 8, 15. Plaintiff had his first chemotherapy appointment in September 2021. *Id*. Following this, his treatment was "inconsistent and inadequate." *Id*. at 8.

Plaintiff states that several of the Agency Defendants, including Holt, Sauls, and Lewis, failed to ensure that adequate policies and systems were in place and adhered to for Plaintiff to receive consistent chemotherapy, despite knowing that their failure to do so created a substantial risk of serious harm to Plaintiff. *Id*. at 15. Plaintiff and his legal team repeatedly notified prison officials of Plaintiff's chemotherapy appointments and his need for treatment every three weeks. *Id*. at 15-16. Despite this notice, Plaintiff received only a fraction of his necessary treatments. *Id*. at 16.

Chemotherapy was abruptly and inexplicably discontinued in January 2023. *Id*. at 8, 16. Although Plaintiff indisputably suffered from Stage IV lung cancer and Dr. Clark had already scheduled Plaintiff's next treatment for February 14, 2023, Plaintiff received no additional chemotherapy for over two years. *Id*. at 16.

In the interim, Plaintiff was taken to a second oncologist, Dr. Hollander, on two occasions in April and May 2023, but Dr. Hollander died in late May before starting or restarting Plaintiff's treatment. *Id*. at 16-17. Thus, Plaintiff did not receive chemotherapy in April and May 2023.

On June 13, 2023, Plaintiff's legal team contacted Defendant Smith, then-Warden Antoine Caldwell, and Deputy General Counsel for GDC Bryan Wilson[5] regarding the discontinuation of Plaintiff's chemotherapy. *Id*. at 17. On June 14, 2023, Wilson reported "that the medical director at GDCP was 'not sure what was the cause for the delay' in chemotherapy treatment" and that "an interim oncologist would follow up with [Plaintiff] on an 'urgent' pending request." *Id*. at 17-18.

Wilson informed Plaintiff's legal team on June 22, 2023, that a new oncologist reviewed Plaintiff's May CT scan, no progression was shown, and another CT scan was scheduled for August 7, 2023. *Id*. at 18. During this time, medical personnel at GDCP who examined Plaintiff opined that chemotherapy should be continued. *Id*.

Plaintiff saw a third oncologist, Dr. Marco Ayulo, on August 29, 2023, who noted both prostate cancer and lung cancer as the reasons for the appointment. *Id*. Dr. Ayulo scheduled a follow-up for November 2023. Plaintiff, however, was not taken for the follow-up appointment until February 20, 2024.[6] *Id*. at 18-19. Dr. Ayulo's only plan of care during the February 2024 visit was to order additional CT scans, order Plaintiffs' port to be flushed, and schedule a follow-up. *Id*. at 19. Plaintiff saw Dr. Ayulo again on April

---

[5] Bryan Wilson told Plaintiff's legal team that he should be the contact person for any of their concerns and Plaintiff's legal team contacted Wilson on numerous occasions. ECF No. 1 at 44 n.2. As discussed below, they continued to personally contact several of the Prison Administration Defendants to express their concerns over Plaintiff's lack of medical care.

[6] Between his first appointment with Dr. Ayulo on August 29, 2023 and his second appointment on February 20, 2024, Plaintiff was hospitalized for a severe heart condition. ECF No. 1 at 18. An October 2023 scan taken during this hospitalization "showed numerous nodules still in his lungs, with possible metastasis." *Id*.

23, 2024, but Dr. Ayulo was unable to move forward with any treatment because no additional CT scans had been done, and Plaintiff's ports had not been flushed. *Id*. Plaintiff experienced severe pain and was taken back to Dr. Ayulo on July 23, 2024. *Id*. at 20. Dr. Ayulo provided no treatment and scheduled a follow-up for August 2024. *Id*.

GDCP provider notes dated September 5, 2024 reveal that internal health workers at the prison found Dr. Ayulo's treatment plan unclear. *Id*. They nevertheless assured Plaintiff that his cancer was being monitored, that it was stable and not growing, and that there was no reason for chemotherapy at the time. *Id*. When Plaintiff was hospitalized for untreated pneumonia[7] in September 2024, a CT scan showed the nodules in his lung had increased in size and number when compared to the December 2021 scan. *Id*. While Plaintiff was not informed of the results of this CT scan, GDCP provider notes in October show that Defendant Mardis received summaries of Plaintiff's medical history. *Id*. at 21. When Plaintiff's legal team learned of the results of the latest CT scan on November 20, 2023, they told Plaintiff of the results and contacted Wilson. *Id*. The legal team told

---

[7] Plaintiff started to experience serious symptoms, including a high fever, lack of appetite, fatigue, hallucinations, difficulty breathing, and coughing up phlegm in September 2024. ECF No. 1 at 41. He was bed-ridden for days. *Id*. Plaintiff made numerous requests to see a physician. *Id*. Defendant Tillman personally observed Plaintiff's deteriorating condition. *Id*. "Finally, on September 20, [Plaintiff] was brought to the GDCP infirmary where he was seen by a doctor. At that point, [Plaintiff's] illness had progressed untreated to such a serious level that he had to be taken to the emergency room for further evaluation and was ultimately hospitalized, where he was diagnosed with pneumonia and a urinary tract infection." *Id*. Antibiotics and a cough suppressant were given at the hospital and prescribed to be given at GDCP. *Id*. But when Plaintiff returned to GDCP, Plaintiff was not given the medication for four days and then not given the medication as prescribed. *Id*. When Plaintiff asked Defendant Tillman about the medication and requested to go to the infirmary, Tillman told him GDCP did not have enough staff to take him to the infirmary. *Id*.

Wilson the results of the latest scan and requested that Plaintiff be seen by an oncologist and receive updated scans so that a treatment plan could be implemented. *Id*. Wilson notified Defendant Mardis of the information and request. *Id*.

Plaintiff saw a fourth oncologist, Dr. Thomas Cartwright, on December 10, 2024. *Id*. at 22. Dr. Cartwright could not start a treatment plan because the records and scans provided by GDCP prison staff were insufficient. *Id*. Plaintiff was not taken to the January 10, 2025 follow-up appointment. *Id*. Plaintiff was taken to the next appointment with Dr. Cartwright on February 3, 2025. *Id*. Dr. Cartwright's notes show that Plaintiff's cancerous nodes had increased in size since an October 2024 CT scan. *Id*. Thus, Plaintiff's cancer, which had gone untreated since January 2023, was progressing. *Id*. Plaintiff had his first chemotherapy treatment in over two years in late April 2025. *Id*. at 23.

Just as he was previously, Plaintiff was put on a three-week treatment schedule. *Id*. at 24. But he was not taken to the May 2025 chemotherapy appointment because medical staff at GDCP prematurely administered steroids that caused Plaintiff's "blood sugar levels to skyrocket for weeks." *Id*. "Defendants Emmons, Tillman, and King were aware of [Plaintiff's] dangerously high blood sugar levels, and yet failed to take any action to control it." *Id*. Plaintiff's legal team again contacted Wilson regarding the missed chemotherapy appointment and Wilson notified Mardis. *Id*. The May chemotherapy appointment was never rescheduled. *Id*. at 25. Plaintiff was not taken back to chemotherapy until six weeks after his last treatment in April 2025. *Id*.

Plaintiff was prescribed morphine[8] for pain, but "GDCP stopped providing [Plaintiff] his morphine medication without warning or without a change in his prescription." *Id*. This has caused Plaintiff to suffer severe pain, intense nausea, and difficulty breathing. *Id*. Plaintiff's legal team repeatedly requested that Plaintiff be seen by a physician so that his condition might be stabilized enough to enable him to undergo his scheduled chemotherapy in August. *Id*. at 25-26. Wilson informed Defendant Mardis of Plaintiff's condition and his legal teams' concerns on numerous occasions. *Id*.

Plaintiff was not taken to his August chemotherapy appointment because the steroid shot that he is required to take prior to receiving chemotherapy had expired. *Id*. at 26. Plaintiff's legal team again contacted Wilson regarding the missed appointment and need to reschedule as soon as possible. *Id*. Wilson again notified Defendant Mardis. *Id*. at 27. The missed appointment was not rescheduled. *Id*.

Plaintiff seeks declaratory and injunctive relief as well as damages. *Id*. at 50.

---

[8] Plaintiff details numerous instances in the past five years in which he has not been provided with his prescribed pain medication or pain management treatments for his various serious chronic medical conditions. ECF No. 1 at 27-40. Beginning in 2022, Plaintiff was prescribed morphine to ease the pain caused by lung cancer. *Id*. at 28. But he is not provided morphine (or other pain medication) "on a regular and uninterrupted basis, causing him intense pain and suffering from both the untreated pain from his underlying conditions, and the additional pain and suffering that is caused by repeated withdrawal from narcotics." *Id*. at 29. The only way he can receive medication is through the pill call process, which is not conducted on a regular basis due to various reasons, including shortages of medical and security staff. *Id*. at 29-30. Plaintiff and his legal team have notified Defendants Beasley, Emmons, Tillman, Smith, Lewis, and Mardis of Plaintiff's failure to receive his prescribed pain medication on numerous occasions. *Id*. at 30-40. Plaintiff states that "Defendants Beasley, Emmons, Tillman, Smith, Lewis, and Mardis are all aware that [Plaintiff's] medications are necessary and yet have failed to ensure that his prescriptions not lapse, causing him years of intense pain and suffering. *Id*. at 40.

III.   Plaintiff's Claims

A. Deliberate Indifference to Serious Medical Needs Claims against all Agency Defendants and Prison Administration Defendants

To state a claim for deliberate indifference to serious medical needs, a plaintiff must allege "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009) (citation omitted).   The first prong is objective, and

a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." In either of these situations, the medical need must be "one that, if left unattended, pos[es] a substantial risk of serious harm."

*Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (alteration in original) (citations omitted).

To establish the second element—deliberate indifference—a plaintiff must plausibly allege that the defendant: (1) "was subjectively aware that the inmate was at risk of serious harm"; (2) "disregarded that risk"; and (3) "acted with 'subjective recklessness as used in the criminal law.'"   *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (quoting *Farmer v. Brennan*, 411 U.S. 825, 839 (1994)).   Subjective awareness requires that the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 837). "'[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.   Each individual defendant must be judged separately and on the

10

basis of what that person kn[ew].'" *Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (alterations in original) (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008)). To establish that a particular "defendant acted with 'subjective recklessness as used in the criminal law'" the plaintiff must allege "that the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm." *Wade*, 106 F.4th at 1255.

Liability cannot be based on simple negligence or medical malpractice, but rather on some sort of conscious disregard for a serious and imminent risk. *Farmer*, 511 U.S. at 834; *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (explaining that mere allegations of negligence or malpractice do not amount to deliberate indifference). "[A] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment" will not support a claim for deliberate indifference. *Harris*, 841 F.2d at 1505 (citation omitted). Whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore does not amount to deliberate indifference under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (citation omitted) (concluding that a dispute between two medical doctors about the adequacy of medical treatment provided -- not about whether treatment was provided at all -- suggested only medical negligence and was no grounds for section 1983 liability). Instead, a plaintiff must demonstrate that the defendant's response to an objectively serious medical need "was poor enough to constitute 'an unnecessary and wanton infliction of pain,' and not merely accidental inadequacy, 'negligen[ce] in diagnosi[s] or treat[ment],'

or even '[m]edical malpractice' actionable under state law." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (alternations in original) (citations omitted); *see Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Indeed, Eleventh Circuit

> recently reiterated, "deliberate indifference is *not* a constitutionalized version of common-law negligence." "To the contrary, we (echoing the Supreme Court) have been at pains to emphasize that 'the deliberate indifference standard . . . is far more onerous than normal tort-based standards of conduct sounding in negligence,' and is in fact akin to 'subjective recklessness as used in the criminal law.'" With respect to prisoners' medical care, in particular, we have held that the Eighth Amendment doesn't require it to be "perfect, the best obtainable, or even very good." Rather, we have emphasized, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."

*Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020) (alterations in original) (citations omitted).

A prison official might act with deliberate indifference by denying or delaying medical care or by providing "medical care which is so cursory as to amount to no treatment at all." *Dang*, 871 F.3d at 1280 (citation omitted). But "[s]ome delay in rendering medical treatment may be tolerable depending on the nature of the medical need and the reason for the delay." *Adams*, 61 F.3d at 1544 (citation omitted).

The final prong simply requires "that a defendant have a causal connection to the constitutional harm." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (citation omitted) (explaining that "as with any tort claim, [plaintiff] must show that the injury was caused by the defendant's wrongful conduct").

When a defendant holds a supervisory positions, such as the Defendants in this case, Plaintiff's alleged facts "must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1047–48 (11th Cir. 2014) (citation omitted). Causal connections can be established by widespread abuse that puts a supervisor on notice. *Id.* at 1048. But such abuse "must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Id.* (citation omitted). Alternatively, a plaintiff may state the necessary causal connection when he alleges "a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (citation omitted). In relation to the latter, "[a] causal connection can be established if a supervisor has the ability to prevent or stop a known constitutional violation by exercising his supervisory authority and he fails to do so." *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1190 (11th Cir. 2011) (citing *Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010)).

Plaintiff's allegations demonstrate that he currently suffers, or suffered in the past, from several serious medical conditions: (1) advanced-stage lung cancer, (2) pneumonia, (3) severe leg pain that has progressed to the point Plaintiff must use a wheelchair, and (4) opioid withdrawal. *See Hinson v. Bias,* 927 F.3d 1103, 1122 (11th Cir. 2018) (citing *McElligott v. Foley*, 182 F.3d 1248, 1255-59 (11th Cir. 1999) (noting that "severe pain that is not promptly or adequately treated can present a serious medical need"); *Brooks v.*

13

*Wilkinson Cnty.,* 393 F. Supp. 3d 1147, 1162-63 (M.D. Ga. 2019) (citing *Mann*, 588 F.3d at 1307) (finding that opioid withdrawal can constitute a serious medical need); *Barker v. Brantley Cnty.,* 832 F. Supp. 346, 352 (S.D. Ga. 1993) (stating that "pneumonia, must without question, be deemed a 'serious medical need'").

The remaining issues are whether Plaintiff has adequately alleged that each of the eleven named Defendants acted with deliberate indifference to his serious medical needs and that the Defendants' actions or inactions caused his constitutional harm. As discussed in detail below, Plaintiff adequately alleges facts to show all the Agency Defendants and Prison Administration Defendants were either personally involved in his failure to receive constitutionally adequate medical care, established (or failed to establish) policies or customs that resulted in his lack of medical care, were aware of severe shortages in medical and security staff that resulted in widespread inadequate medical care, or were in a position as supervisor to prevent the lack of medical care, but failed to do so.

(1) Ahmed Holt and Jack "Randy" Sauls

Plaintiff sues Holt in his official capacity[9] as Assistant Commissioner of the Facilities Division of GDC and Sauls in his official capacity as Assistant Commissioner of

---

[9] A suit against a state official in her official position is a suit against the State. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Thus, the official has absolute immunity from monetary damages. *See Hobbs v. Roberts*, 999 F.2d 1526, 1528 (11th Cir. 1993) (citation omitted) (stating that "the Eleventh Amendment bars federal suits [for damages] against state officials in their 'official capacity' because such actions seek recovery from state funds"). The only relief available is declaratory and prospective injunctive relief. *Welch v. Laney*, 57 F.3d 1004, 1008 (11th Cir. 1995) (stating that "the Eleventh Amendment does not insulate state officials acting in their official capacities from suit in federal court, at least to the extent the complainant seeks prospective injunctive relief").

the Health Services Division of GDC.  ECF No. 1 at 4-5.  He alleges both Defendants (1)"had direct knowledge of the shortages in medical [and security] staffing and the impact of inadequate . . . staffing on the provision of healthcare at GDCP through numerous reports provided to them[,]" including a 2024 System-Wide Assessment of GDC Report that warned vacancy rates at GDCP had reached "'emergency levels,'" and both knew that these shortages prevented Plaintiff "from obtaining the medical care he desperately needed and yet still failed to remedy the shortfalls" (*Id*. at 13-14, 47); (2) failed to "ensure that adequate policies and systems were in place and adhered to so that [Plaintiff] received []his necessary regimen of treatment" even though they knew that their failure to do so "created a substantial risk of serious harm to prisoners like [Plaintiff]" (*Id*. at 15); and (3) had "customs and policies—as well as failure to monitor the safety and care of [Plaintiff], with which they are tasked—[that] resulted in deliberate indifference to [Plaintiff's] constitutional rights" and they possessed "direct knowledge of the . . . systemic failures, unconstitutional conditions at GDCP, and numerous instances of constitutionally deficient medical care from staffing reports, internal and external audits, incident reports, and communications to [Wilson,] the Deputy General Counsel" (*Id*. at 46).

Plaintiff has alleged sufficient facts to show a causal connection between these two Defendants' actions or inactions and his alleged unconstitutional medical care based on policies and customs and widespread abuse.  To ultimately "prov[e] that a policy (or absence thereof) or custom caused a constitutional harm [will] require [Plaintiff] to point to multiple incidents.  *Myrick v. Fulton Cnty., Ga*., 69 F.4th 1277, 1299 (11th Cir. 2023) (citations omitted).  At this stage in the litigation, Plaintiff sufficiently alleges "numerous

instances of constitutionally deficient medical care" have resulted from the policy or custom of medical and security understaffing and/or the lack of policy or custom regarding medical care for chronically ill inmates in GDCP generally, and in G-House (where Plaintiff is housed) specifically.  ECF No. 1 at 13-14, 46-47.  He also alleges that the instances of constitutionally deficient medical care due to staffing shortages and/or a lack of medical procedure (or failure to follow the medical procedure) at GDCP is widespread and detailed in staffing reports, audits, and assessments.  Finally, Plaintiff alleges that despite the knowledge of significant deficiencies in staff and protocol to obtain medical care at GDCP, both Defendants have failed to reasonably respond, and this failure has caused his health to suffer significantly.

    (2) Dr. Marlah Mardis and Sharon Lewis

    Dr. Marlah Mardis has been Statewide Medical Director of GDC since April 2024 and Sharon Lewis was the Statewide Medical Director of GDC during all times relevant to this complaint[10] until her retirement in 2024.  *Id*. at 5-6.  Plaintiff sues Mardis in both her

---

[10] Plaintiff filed this complaint on August 25, 2025.  ECF No. 1.  The statute of limitations for a 42 U.S.C. § 1983 action filed in Georgia is two years.  *Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003).  Federal law determines when the statute of limitations accrues. *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996).  Some of the events described in Plaintiff's complaint occurred more than two years prior to August 25, 2025.  *See, e.g*., ECF No. 1 at 1 (stating that Plaintiff was tested for and diagnosed with lung cancer in July 2020, which was over six months after Plaintiff showed "alarming symptoms of a malignancy in his lungs"); *Id*. at 2 (despite pleas from his legal team and oncologist, GDCP staff and GDC officials did allow Plaintiff to start chemotherapy until over one year after his lung cancer diagnosis in July 2020).  The Court can dismiss a complaint or claims in a complaint only if it is clear on the face of the complaint that the action or claim would be barred by the statute of limitations.  *Hughes v. Lott*, 350 F.3d 1157, 1163 (11th Cir. 2003). That is not the case in this action because the continuing violation analysis may apply to Plaintiff's deliberate indifference claim.  *See Seibert v. Comm'r, Ga. Dep't of Corr*., 680

16

individual capacity and official capacity as Statewide Medical Director of GDC and sues Lewis in her individual capacity.  *Id*.

Plaintiff alleges that "Defendants Mardis and Lewis had direct knowledge of the routine delays and denials of Mr. Miller's necessary health care and interruptions in medication."  *Id*. at 14.  Defendants Mardis and Lewis were told on numerous occasions that Plaintiff was not receiving chemotherapy as ordered by his oncologist and that his condition was deteriorating due to the lack of treatment.  *Id*. at 14, 15, 21, 24, 27, 44, 48. They both knew that Plaintiff was not receiving his pain medication as prescribed and knew the severe and debilitating withdrawal symptoms that he suffered as a result.  *Id*. at 25-26, 32, 34-35, 38, 39-40, 44, 38.   Additionally, Mardis received summaries of Plaintiff's medical history.  *Id*. at 21, 45, 48.  Plaintiff alleges that despite this knowledge, Mardis and Lewis failed to ensure that he received medically necessary treatment, such as chemotherapy, and his medication as prescribed.   *Id*. at 15, 46.   Plaintiff has alleged sufficient facts, at this stage in the litigation, to demonstrate that both Mardis and Lewis were personally involved in the denial of constitutionally adequate medical care, or they knew that Plaintiff was not receiving constitutionally adequate medical care and could have intervened but failed to do so.

(3) Jacob Beasley and Shawn Emmons

Jacob Beasley has been GDCP Warden since July 2025, and Shawn Emmons was GDCP Warden from July 2023 until July 2025.  *Id*. at 6-7.  Plaintiff sues Beasley in his

---

F. App'x 837, 839 (2017) (per curiam).  At this stage, it is not clear on the face of Plaintiff's compliant his action is barred by the statute of limitations.

individual and official capacities and Emmons in his individual capacity. *Id*. Both Plaintiff and his legal team have told Beasley and Emmons their concerns regarding Plaintiff's failure to receive medical treatments, such as chemotherapy, and narcotic pain medication as prescribed. *Id*. at 27, 40, 44. Plaintiff "has made multiple sick call requests and verbal pleas to . . . Defendant Beasley, to see a doctor about the intense and negative symptoms he has had from the abrupt cessation of his morphine, to no avail." *Id*. at 38. These Defendants have seen Plaintiff in severe pain on numerous occasions and have seen Plaintiff's medical records, which document his lung cancer, treatment plan (and failure to follow the treatment plan), and repeated lapses in Plaintiff's narcotic pain medication. *Id*. at 44-45. Through first-hand experience and various reports, both Beasley and Emmons were aware of the shortage in medical and security staff and aware that inmates housed in G-house, such as Plaintiff, could not obtain sick-call requests as needed, all of which resulted in Plaintiff's inability to receive his medication and treatments as prescribed. *Id*. at 47-48. Both have failed to ensure that Plaintiff's prescriptions did not lapse, despite their knowledge that the lapses would cause Plaintiff intense pain and suffering. *Id*. at 40. Plaintiff alleges that despite knowledge of Plaintiff's serious medical conditions and lack of care, Beasley and Emmons have failed to take steps to ensure Plaintiff receives constitutionally adequate medical care. Plaintiff has alleged sufficient facts, at this stage in the litigation, to show that Beasley and Emmons were personally involved in his failure to receive constitutionally adequate medical care or had direct knowledge of the inadequate medical care and were in a position to exercise supervisory authority to enable Plaintiff to obtain adequate care and the appropriate medication but failed to do so.

18

(4) Sheneca King, Timothy Roberts, and Mark Agbaosi

Sheneca King has been a Deputy Warden of Security at GDCP since January 2022; Timothy Roberts has been a Deputy Warden of Security at GDCP since June 2024; and Mark Agbaosi was a Deputy Warden of Security at GDCP from December 2022 until February 2025. *Id*. at 6-7. Both King and Roberts are sued in their individual and official capacities while Agbaosi is sued in his individual capacity. *Id*. at 6-7. Plaintiff alleges that Defendant King was personally aware of Plaintiff's dangerously high blood sugar levels in May 2025 when medical staff prematurely administered steroids. *Id*. at 24. Plaintiff states that King took no action to control Plaintiff's blood sugar levels. *Id*. Plaintiff alleges that King and Roberts have both viewed Plaintiff's medical and institutional records that show his "cancer, treatment plans, and years of symptoms, including pain levels reaching '10/10' and characterized as 'agony' due to repeated lapses in his narcotic pain medication." *Id*. at 44. Plaintiff states that King, Roberts, and Agbaosi have direct knowledge through reports and their own first-hand experience that Plaintiff is unable to obtain timely medical care in part due to understaffing at GDCP and to the lack of procedure to receive and process sick call request forms for inmates housed in G-house, such as Plaintiff. *Id*. at 47-48. Finally, Plaintiff states that he, his legal team, and his medical records have all made King, Roberts, and Agbaoi aware of the routine delays and denials of his necessary medical treatments and medication. *Id*. at 48. Plaintiff has alleged sufficient facts, at this stage in the litigation, to show that these three Defendants have been personally involved in his alleged denial of medical care. *Id*.

19

(5) Alexander Tillman and LaChesha Smith

Alexander Tillman was the Deputy Warden of Care and Treatment at GDCP from December 2022 until February 2025 and LaChesha Smith was the Deputy Warden of Care and Treatment at GDCP from December 2022 to July 2024.   *Id*. at 7.  Both are sued in their individual capacities.  *Id*.  As explained above, in September 2024, Plaintiff began to experience a high fever, lack of appetite, fatigue, hallucinations, difficulty breathing, and coughing up phlegm.  *Id*. at 12-13, 41. Defendant Tillman personally observed Plaintiff's deteriorating condition but did not obtain medical help for Plaintiff.  *Id*.  Due to the delay in treatment, Plaintiff had to be taken to an emergency room and hospitalized at an outside hospital.  He was diagnosed with pneumonia and a urinary tract infection.  *Id*.  When he returned to GDCP, he was not given his medication for four days and, as a result, began to experience symptoms again.  *Id*. at 41.  Plaintiff spoke with Tillman, who refused to have him taken to the infirmary because GDCP did not have adequate staff to take him.  *Id*.

Tillman was also personally aware of the dangerously high blood sugar levels that Plaintiff experienced in May 2025, which forced him to miss his scheduled chemotherapy. *Id* at 24.   Tillman took no action regarding Plaintiff's blood pressure or missed chemotherapy.  *Id*.  Tillman also made rounds with GDCP nurses on occasion and saw that Plaintiff was not receiving his prescribed medication in a consistent and timely manner.  *Id* at 33, 41.  Plaintiff notified Tillman of his severe leg pain in early 2024.  *Id*. at 42.  Despite this notification and numerous sick call requests, Plaintiff has not seen a specialist.  *Id*. at 42-43.  Plaintiff's leg pain and numbness have increased to the point that Plaintiff is in severe pain every day and must use a wheelchair.  *Id*. at 42-44.

Plaintiff and his legal team have directly and routinely raised concerns with Smith regarding Plaintiff's failure to receive prescribed chemotherapy treatments and inconsistent receipt of medication. *Id*. at 15, 17, 27, 30-34, 44. Specifically, Plaintiff's legal team emailed Smith in May 2023 about Plaintiff's failure to receive prescribed pain medication and contacted Smith again June 13, 2023 to express concerns that Plaintiff had not had chemotherapy for more than six months, even though he was supposed to have chemotherapy every three weeks. *Id*. at 17, 30. Smith was aware that Plaintiff had not received his prescribed pain medication for over more than five consecutive days in October 2023. *Id*. at 30-31. Plaintiff was in severe pain and a physician, Dr. Fowler, advised that he be taken to the emergency room. *Id*. Instead, Smith had Plaintiff placed in an "observation room" until they finally managed to locate and administer the pain medication. *Id*. at 31. Plaintiff's legal team contacted Smith again on December 13, 2023, and on January 10, 2024, to express concern that Plaintiff had gone without his prescribed morphine for days and was in severe pain. *Id*.

Plaintiff has adequately alleged facts demonstrating that Tillman and Smith directly participated in the denial of constitutionally adequate medical care. He has alleged that despite their subjective awareness of Plaintiff's serious medical conditions and lack of care, both failed to take steps to ensure Plaintiff receives constitutionally adequate care.

IV.    Conclusion

At this stage in the litigation, Plaintiff has alleged sufficient factual content to allow his action to proceed for further factual development. It is, therefore, **ORDERED** that Plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim

21

proceed against all named Defendants.  Defendants have been served with process and will be required to file timely responsive pleadings as required by the Federal Rules of Civil Procedure. Because the complaint has been screened pursuant to 28 U.S.C. § 1915A, Defendants may not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). The Court will enter a separate discovery and scheduling order as warranted.

**SO ORDERED**, this 6th day of October, 2025.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge

22